IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| IRONSHORE EUROPE DAC | § § § | |
| *Plaintiff* | § § | |
| VS. | § | No. 2:17-cv-431 |
| SCHIFF HARDIN, LLP | § § § | **Jury** |
| *Defendant* | | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff IRONSHORE EUROPE DAC, formerly known as Ironshore Europe Limited, ("Ironshore"), files this First Amended Complaint against Defendant, SCHIFF HARDIN, LLP ("Schiff"), and as grounds respectfully shows the following:

### OVERVIEW

1.   This is a case of negligent misrepresentations by Schiff, a large national law firm, to Ironshore, an Irish insurance company, regarding an underlying lawsuit (the "Lawsuit").

2.   In November 2014, Ironshore issued a liability insurance policy (the "Ironshore Policy") to a product manufacturer ("Dorel"). In May 2015, Plaintiffs filed the Lawsuit, in this Court, against Dorel, who retained Schiff to defend the Lawsuit.

3.   In the course of its business, Schiff made representations to Ironshore knowing Ironshore would rely upon Schiff's representations. Schiff provided false information for the guidance of Ironshore knowing Ironshore would use such information in its business. This false information consisted of verbal and written reports to Ironshore that included material factual

misrepresentations of existing facts, professional evaluations based upon material misrepresentations of existing facts, and material non-disclosures of the true facts. In fact, Schiff expressly represented that its reports to Ironshore were designed to allow Ironshore to be fully up to speed on the status of the Lawsuit and to gauge the exposure presented by the Lawsuit from a business perspective.

4.      Ironshore justifiably relied upon the false information provided by Schiff to its detriment. Ironshore justifiably relied upon Schiff to use reasonable care and competence in making representations to Ironshore concerning the Lawsuit. Schiff knew Ironshore was relying upon this false information and Schiff intended, encouraged and invited this reliance.

5.      Schiff failed to exercise reasonable care or competence in communicating the information to Ironshore.

6.      Schiff's negligent misrepresentations and false information proximately caused Ironshore to sustain millions of dollars of damages, and Ironshore seeks to recover its damages and other relief from Schiff as set forth below.

## PARTIES

7.      Ironshore is an Irish insurance company, with its principal place of business in Dublin, Ireland.

8.      Schiff claims it is a limited liability partnership organized and existing under the laws of the State of Illinois, and that none of its partners are a citizen of Texas or Ireland. Schiff has appeared herein.

## JURISDICTION AND VENUE

9. Based upon the foregoing, this Court has jurisdiction of this action under 28 U.S.C. §1332 (diversity of citizenship) as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

10. The amount in controversy exceeds $75,000 exclusive of interest and costs.

## BACKGROUND FACTS

11. Schiff is a large national law firm with offices throughout the United States.

12. In November 2014, Ironshore issued the Ironshore Policy to Dorel.

13. In May 2015, a mother and minor child ("Plaintiffs") sued Dorel in the underlying Lawsuit. The Plaintiffs in that matter alleged Dorel failed to warn that its front-facing child seat was unreasonably dangerous for a child under age 2, and that failure caused the minor Plaintiff, under age 2, severe injuries. The Plaintiffs in the Lawsuit sought recovery of actual and exemplary damages from Dorel.

14. Dorel hired Schiff to defend it in the Lawsuit. In 2015 and most of 2016, Schiff defended Dorel in the Lawsuit.

15. In the course of Schiff's business, Schiff provided Ironshore oral and written reports about the Lawsuit for Ironshore's guidance. Schiff's representations to Ironshore were intended to guide Ironshore in its business. Such representations were made by Schiff separate from its representation and defense of Dorel in the Lawsuit and were not necessary to, nor a part of, Schiff's defense of Dorel in the Lawsuit.

16. Schiff had manifest awareness Ironshore would rely and did rely upon Schiff's reporting, and Schiff invited and intended Ironshore to rely upon its reports. In fact, Schiff expressly represented to Ironshore that Schiff's "litigation summaries" were "designed both to allow all

interested parties (including Ironshore) to fully be up to speed on the status of pending matters and to gauge the timing and exposure that the cases represent from a business perspective". Schiff overtly encouraged and invited Ironshore's reliance as well by welcoming the opportunity to be of service to Ironshore and noting that Schiff was "wholly committed to providing whatever you [Ironshore] need whenever you [Ironshore] need it."

17. Schiff reported upon the Lawsuit to Ironshore's claim manager located in London, England.

18. When reporting to Ironshore, Schiff knew or should have known that Schiff should disclose the whole truth; that Schiff should disclose additional information when partial disclosure conveyed a false impression; and, that Schiff should disclose new information revealing earlier representations as false or misleading. Yet, Schiff failed to do so - - thereby misleading Ironshore to believe the Lawsuit posed no threat to Ironshore's policy limits.

19. Schiff believed Dorel's "Self-Insured Retention" was $6.0 million and that a settlement of the Lawsuit over $6.0 million would be within Ironshore's policy limits.

20. At various times during the Lawsuit, Schiff misrepresented to Ironshore that a settlement within Ironshore's policy limits was "unwarranted".

21. While Ironshore was not obligated to defend Dorel under the Ironshore Policy, the Policy expressly provided that:

> [Ironshore] shall have the right and shall be given the opportunity to associate with the Insured . . . both in the defense and control of any Claim, suit or proceeding relative to any Occurrence where the Claim or suit involves, or appears reasonably likely to involve, [Ironshore], in which event the Insured and [Ironshore] shall cooperate in all things in the defense of such Claim, suit or proceeding.

22. As described below, Schiff's various misrepresentations led Ironshore to believe that the Ironshore Policy was not at risk. Thus, Ironshore did not associate in the defense of the lawsuit.

23. Beginning in October 2015, Schiff began making representations to Ironshore for Ironshore's guidance.

24. Schiff's reporting negligently and falsely misrepresented the facts of the Lawsuit, its settlement value, and the exposure it presented to Ironshore's Policy.

25. For example, on March 16, 2016, Schiff advised Ironshore that mediation was set for April 2016; that Schiff expected Plaintiffs to make a settlement demand within Ironshore's policy limits; and, that a demand within Ironshore's policy limits was unwarranted.

26. By March 16, 2016, discovery had been underway for several months.

27. By that time, Schiff knew or should have known that discovery had not only revealed evidentiary support for Plaintiffs' claims of liability, but also for Plaintiffs' damage claims in excess of $30 million. Contrary to Schiff's representations to Ironshore, Schiff knew or should have known that a settlement demand in excess of $6 million was plainly *warranted* by the facts of the case.

28. Nevertheless, on March 24, 2016, Schiff again negligently misrepresented that the Lawsuit would not involve Ironshore's policy limits and recommended that Ironshore set no reserves.

29. On April 6, 2016, Schiff forwarded a $7.0 million settlement demand from Plaintiffs. Yet, Schiff was dismissive of the demand, representing it was a transparent attempt to get Ironshore's attention and that Schiff's valuation of the case had not changed.

30. On April 7, 2016, Schiff provided Ironshore information representing that:

   a) Plaintiffs' $7.0 million settlement demand was not a "realistic assessment of the facts of this case";

   b) an industry study showing front-facing child seats unsafe for children under age 2 was "irrelevant";

   c) Dorel rejects the idea that the minor Plaintiff "has any sort of brain injury and refuses to place any value on it"; and

      d) "Plaintiffs have already reached their ceiling of recovery" by an earlier settlement.

31. Schiff knew or should have known the foregoing information was false and misleading. Yet, Schiff did not use reasonable care or competence in communicating the information to Ironshore. Schiff did not disclose the whole truth, nor did Schiff provide complete information necessary to dispel the false impressions created by Schiff's partial and misleading reporting.

32. Upon information and belief, by April 7, 2016, Schiff knew or should have known that contrary to Schiff's reporting:

    a. Plaintiffs' $7.0 million settlement demand was warranted by, and a realistic assessment of, the facts of the case known to Schiff at that time;

    b. the industry study concerning the risks of the product was highly relevant;

    c. Plaintiffs' experts supported Plaintiffs' claim of brain injury - a claim of great value; and,

    d. Plaintiffs had not reached a "ceiling of recovery" by the earlier settlement.

33. By April 2016, Schiff knew - but failed to disclose to Ironshore - that Dorel actually faced an uphill battle in the Lawsuit because Dorel had strongly urged, for many years, the same position that Plaintiffs were advancing in the Lawsuit - - front facing seats were dangerous for kids under the age of two.

34. On May 20, 2016, Schiff reported to Ironshore that the trial date had advanced. Yet, Schiff falsely represented that the early trial date did not prejudice their preparations.

35. Ironshore did not know that Schiff was representing just the opposite to this Court in a motion filed under seal on April 15, 2016. Ironshore now knows that in that motion Schiff sought to strike the supplemental report of Plaintiffs' expert, Dr. Altman, served on March 9, 2016. Dr. Altman's report concluded that the minor Plaintiff most likely sustained an acquired brain injury in the accident. Schiff's motion argued that Dorel would suffer "enormous" prejudice unless the

Court struck Dr. Altman's opinion of brain injury and, if the opinion were not struck, "trial would need to be postponed for months."

36. Before trial of the Lawsuit, Schiff never disclosed to Ironshore: a) Dr. Altman's report; b) that Dorel would suffer enormous prejudice unless the Court struck Dr. Altman's opinion; or, c) that trial would need postponement for months.

37. On May 23, 2016, Schiff represented it welcomed the opportunity to be of service and noted that Schiff was "wholly committed to providing whatever you [Ironshore] need whenever you [Ironshore] need it."

38. Yet, in June 2016, with less than a week before trial, Schiff continued to provide Ironshore far less than what Ironshore needed and what Schiff was obligated to provide - the whole truth! Instead, Schiff continued to withhold the whole truth and failed to disclose new information that would expose Schiff's earlier representations as false and misleading.

39. On June 10, 2016, Schiff continued its bullish misrepresentations, forwarding to Ironshore a recent mock jury study. Yet, while providing the hypothetical study to Ironshore, Schiff wholly failed to disclose actual developments in the Lawsuit devastating to Schiff's defense - - two (2) Orders filed June 9, 2016.

40. The first Order [Doc. 149] granted summary judgment against certain of Dorel's affirmative defenses. Further, it denied Schiff's motion for summary judgment on Plaintiffs' liability and punitive damage claims. Schiff's motion had argued Plaintiffs could not prove that the minor Plaintiff's injury was foreseeable to Dorel - - a requirement for liability. In denying Schiff's motion, the Court held that "a reasonable jury could find that [Plaintiff] has established the foreseeability element of the failure to warn claim". Schiff's motion had further argued that Plaintiffs' proof did not support a punitive damage claim. The Court disagreed, holding that:

> [Plaintiff] has cited evidence that serious spinal cord injuries were foreseeable to and foreseen by Dorel and a reasonable jury could conclude that this constituted an 'extreme degree of risk'. In sum, [Plaintiff] has cited specific and sufficient evidence such that at trial a reasonable jury could find by clear and convincing evidence that Dorel was grossly negligent.

41. The second Order [Doc. 150] denied Schiff's motions to exclude: expert testimony from Dr. Altman and other purported experts; evidence that the minor plaintiff suffered a brain injury; and, related expert opinions of damage resulting from such injury. Schiff also failed to disclose other adverse rulings that held that Dorel's post-accident conduct was also relevant and admissible.

42. Schiff knew or should have known that it should disclose the whole truth to Ironshore; that it should disclose additional information when its partial disclosure conveyed a false impression; and, that it should disclose new information that would reveal an earlier representation to be misleading or untrue. By failing to disclose the adverse orders to Ironshore, Schiff failed to discharge its duties to Ironshore, and failed to exercise reasonable care or competence in communicating information to Ironshore.

43. Furthermore, having represented to the Court that Dorel would suffer "enormous" prejudice unless the Court struck Plaintiffs' expert's opinion of brain injury, and if that opinion was not struck, the trial would need to be postponed for several months, Schiff clearly knew its representation to Ironshore that the early trial date did not prejudice Schiff's trial preparations was false and would be relied upon by Ironshore. Ironshore in fact relied on Schiff's representation and, as a result, sustained damages. If Schiff believed what it had represented to the Court - -, that Dorel would suffer "enormous" prejudice or would need additional time - - Schiff necessarily knew Ironshore would suffer similar "enormous" prejudice.

44. Had Schiff disclosed the Orders to Ironshore, it would have revealed that Schiff's earlier representations were false and misleading. Among other things, the new information would have revealed that:

  a) Plaintiffs' $7.0 million settlement demand was a realistic assessment of the case;

  b) the industry study regarding the dangers of the product was highly relevant;

  c) the minor Plaintiff had a brain injury and its value was substantial;

  d) the earlier settlement had not established Plaintiffs' ceiling of recovery; and

  e) Ironshore's Policy was in great danger.

45. Rather than disclose the Orders, however, Schiff continued to issue misleading status reports to Ironshore concerning the progress of the trial: e.g. "Day 1 went pretty well"; "On balance, today [day 2] was fine"; and, "We put on our whole case on Day 3. It went well."

46. After trial and jury deliberations, the jury returned a $34 million dollar verdict against Dorel. The verdict exceeded both Dorel's Self-Insured Retention and Ironshore's policy limits.

47. To avoid a disastrous final judgment, Ironshore was compelled to settle the case and funded the vast majority of the settlement.

48. After trial, Ironshore also learned that Schiff had not disclosed to Ironshore all of Plaintiffs' settlement offers. Before trial, Schiff falsely represented that the last offer of settlement received from Plaintiffs was $6.5 million. Schiff failed to disclose to Ironshore, however, that Plaintiffs actually offered to settle for $3.25 million. After trial, Schiff finally admitted to Ironshore the truth - that Plaintiffs made a $3.25 million offer to settle and Schiff failed to disclose it to Ironshore. Upon information and belief, Plaintiffs actually would have settled for less before trial.

49. Had Schiff timely reported the settlement offer and apprised Ironshore of the true facts related to the case, Ironshore would have exercised its right to settle the case. Had Dorel declined

to accept the settlement and fund the settlement, Ironshore would have exercised its right to protect its own economic interests. In that regard, Ironshore would have paid the Plaintiffs to release all claims, and Ironshore would have reserved its right to pursue recovery of the settlement payment from Dorel, the primary obligor.

50. Schiff's false and misleading representations and omissions were not merely negligent. They were grossly negligent. When viewed objectively from Schiff's standpoint, Schiff's false and misleading representations and omissions involved an extreme degree of risk to Ironshore, considering the probability and magnitude of the potential harm to Ironshore. Despite Schiff's actual awareness of the risks involved, Schiff provided Ironshore false, misleading and omission-laden information regarding the state of affairs in the Lawsuit and the exposure presented to Ironshore's Policy. Schiff did so with reckless disregard for the rights and welfare of Ironshore. Accordingly, Ironshore seeks to recover an award of exemplary damages against Schiff, in an amount equal to two times the economic damages sustained by Ironshore.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

51. Ironshore hereby incorporates the matters previously asserted in paragraphs 1 through 50.

52. Ironshore asserts a negligent misrepresentation cause of action against Schiff. Schiff owed duties to Ironshore which Schiff breached. These duties arose because Schiff, in the course of its business, supplied information to Ironshore for the guidance of Ironshore in its business and, in doing so, encouraged, invited and knew Ironshore would justifiably rely upon and use the information in Ironshore's business.

53. Schiff provided false information to guide Ironshore in its business affairs, and this false information was recklessly or negligently provided notwithstanding contrary facts known to Schiff at the time Schiff communicated this false information to Ironshore.

54. In Texas, when a party voluntarily discloses information, it has a duty to disclose the whole truth. When a party makes a partial disclosure, it has the further duty to provide additional information to eliminate any false impression. When a party makes a representation and is aware of new information that makes an earlier representation misleading or untrue, it has a duty to disclose the new information. Schiff violated each of these duties, and proximately caused millions of dollars of actual damages to Ironshore.

55. Ironshore will show that:

   a) Schiff made material misrepresentations of existing facts to Ironshore in the course of Schiff's business;

   b) Schiff provided professional evaluations to Ironshore based upon material misstatements of existing facts and failed to disclose material information that would have corrected the misleading and false nature of the information provided to Ironshore;

   c) Schiff's misrepresentations supplied false and misleading information for the guidance of Ironshore in Ironshore's business; Schiff intended, invited and encouraged Ironshore's reliance upon its material misrepresentations and knew that it was providing Ironshore with false information for Ironshore's business purposes;

   d) Schiff did not exercise reasonable care in communicating the false information to Ironshore;

   e) Ironshore justifiably relied on Schiff's misrepresentations; and,

   f) Schiff's negligent misrepresentations proximately caused actual damages to Ironshore for which damages Ironshore now sues.

### GROSS NEGLIGENCE AND EXEMPLARY DAMAGES

56. Further, Ironshore will show that Schiff was grossly negligent, entitling Ironshore to recover exemplary damages up to twice the amount of Ironshore's economic damages.

## RELIEF REQUESTED

57.     Accordingly, in this action Ironshore seeks to recover a judgment against Schiff awarding Ironshore all of its actual damages, exemplary damages up to twice the economic losses of Ironshore, pre-judgment and post-judgment interest at the legal rate, and all other and further relief as may be just and necessary.

## JURY DEMAND

58.     Pursuant to Federal Rule of Civil Procedure 38(b), Ironshore requests a trial by jury of all issues raised by this First Amended Complaint which are triable by jury.

## DEMAND FOR RELIEF AND JUDGMENT

WHEREFORE, PREMISES CONSIDERED, Ironshore prays that Schiff be required to answer herein, that this cause be set down for trial before a jury, that Ironshore recover judgment against Schiff for actual damages, exemplary damages, prejudgment and post judgment interest permitted by law, costs of court, and any other and further relief to which Ironshore may be justly entitled.

Respectfully submitted,

PARSONS MCENTIRE MCCLEARY & CLARK PLLC

*/s/ Sawnie A. McEntire*

Sawnie A. McEntire
LEAD ATTORNEY
State Bar No.13590100
smcentire@pmmclaw.com

1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone (214) 237-4300
Facsimile (213) 237-4340

AND

Jeffrey R. Parsons
State Bar No. 15547200
jparsons@pmmclaw.com

Angela R. Webster
State Bar No. 24066009
awebster@pmmclaw.com

One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713-960-7347

**ATTORNEYS FOR PLAINTIFF,
IRONSHORE EUROPE DAC**

## **CERTIFICATE OF SERVICE**

  As required by Local Rule CV-5, I certify that a true and correct copy of the foregoing instrument was served on all counsel of record on June 26, 2017, through the CM/ECF system.

| | |
|---|---|
| George M. Kryder | *By E-Service and Fax* |
| Melissa L. James | |
| V<small>INSON</small> & E<small>LKINS</small> LLP | |
| 3700 Trammell Crow Center | |
| 2001 Ross Avenue | |
| Dallas, Texas 75201-2975 | |
| Fax (214) 220-7716 | |

*Attorneys for Defendant Schiff Hardin, LLP*

                /s/ Sawnie A. McEntire
                Sawnie A. McEntire