IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| IRONSHORE EUROPE DAC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | No. 2:17-cv-431 |
| | § | |
| SCHIFF HARDIN LLP, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

**SCHIFF HARDIN LLP'S MOTION FOR SUMMARY JUDGMENT**

George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Jeremy M. Reichman
  State Bar No. 24083722
  jreichman@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Telephone: (214) 220-7700
Fax: (214) 220-7716

*Attorneys for Defendant Schiff Hardin LLP*

## STATEMENT OF ISSUES UNDER LOCAL RULE CV-56(A)

Under Fed. R. Civ. P. 56, Schiff Hardin LLP ("Schiff") respectfully urges the Court to grant summary judgment in its favor on Ironshore Europe DAC's ("Ironshore") negligent misrepresentation and gross negligence claims and dismiss with prejudice all claims based upon the arguments and evidence on file, as a matter of law and undisputed fact, because:

1. Ironshore has no evidence that Schiff proximately caused Ironshore's alleged damages.

2. Ironshore has no evidence to support its claim that it was "compelled" to settle the *Hinson* Case to avoid a hypothetical, never-entered "disastrous final judgment."

3. As a matter of law under unambiguous contractual language, Ironshore had no right to settle the *Hinson* Case behind Dorel's back or over Dorel's objection, and Dorel had no contractual duty to seek or allow a settlement of the *Hinson* Case.

4. Ironshore cannot prove causation because it has no evidence that each of the multiple necessary parties actually would have agreed to settle the *Hinson* Case for a certain amount, on a certain date, on specific terms but for Schiff's conduct.

5. Ironshore's alleged damages, caused by contractually indemnifying Dorel under the insurance policy, are barred by the economic loss rule.

6. Schiff's statements expressing subjective beliefs about case settlement and exposure values and predicting the uncertain outcome of a future jury trial are not statements of existing fact and cannot support a negligent misrepresentation claim.

7. Ironshore has no evidence that Schiff's statements were false or even negligent.

8. Omissions are not actionable as negligent misrepresentations.

## TABLE OF CONTENTS

STATEMENT OF ISSUES UNDER LOCAL RULE CV-56(A) ....................................................I

I.      STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 3

II.     IRONSHORE HAS NO EVIDENCE ON PROXIMATE CAUSE, WHICH
        ENTITLES SCHIFF TO JUDGMENT AS A MATTER OF LAW................................. 7

        A.      There is no evidence that Ironshore was "compelled" to settle the Hinson
                Case to avoid a hypothetical, never-entered "disastrous final judgment." ............. 9

        B.      Ironshore had no contractual right to settle the Hinson Case behind Dorel's
                back or over its objection – only the obligation to indemnify Dorel under
                the Policy – and Dorel had no duty to seek or allow a settlement. ...................... 11

        C.      Ironshore admits that any pre-trial settlement it might have tried to negotiate
                over Dorel's objection would be "speculative," and it cannot show that each
                of the multiple necessary parties actually would have settled the Hinson
                Case for a certain amount, on a certain date, on specific terms, but for
                Schiff's alleged conduct...................................................................................... 14

        D.      Ironshore's theories of recovery based on contractually indemnifying Dorel
                under the Policy are barred under the economic loss rule. .................................. 18

III.    IRONSHORE HAS NO EVIDENCE ON THE FALSE INFORMATION
        ELEMENT, WHICH ENTITLES SCHIFF TO JUDGMENT AS A MATTER OF
        LAW. ..................................................................................................................... 22

        A.      Opinions expressing subjective beliefs about case settlement and exposure
                values and predicting the uncertain outcome of a future jury trial are not
                statements of existing fact and cannot support a negligent misrepresentation
                claim..................................................................................................................... 23

        B.      Ironshore has no evidence that Schiff's statements were false or even
                negligent or that Schiff's preparation and trial of the Hinson Case did not
                meet an attorney's standard of care. ................................................................... 26

        C.      Omissions are not actionable as negligent misrepresentations. ........................... 28

IV.     CONCLUSION........................................................................................................ 30

To The Honorable Rodney Gilstrap, United States District Judge:

No Texas or Fifth Circuit case imposes liability on an insured client's self-retained and paid defense attorneys for their communications with an excess insurance carrier on the insured's behalf, expressing the attorneys' beliefs about case settlement and exposure values and the uncertain outcome of a future jury trial.  As this Court recently noted, Plaintiff Ironshore Europe DAC ("Ironshore") complains that its insured's trial attorneys, Schiff Hardin LLP ("Schiff"), made statements expressing subjective beliefs about the underlying case's settlement and exposure values and potential outcome[1] – which cannot support Ironshore's negligent misrepresentation claim against Schiff as a matter of law.  Likewise, alleged omissions are insufficient as a matter of law to satisfy the "false information" element of a negligent misrepresentation claim.  In any event, Ironshore has no evidence that Schiff's opinions were false or negligent.[2]

Ironshore was neither Schiff's client nor a party to the underlying case.[3]  Nevertheless, Ironshore has sued Schiff for negligent misrepresentation, seeking alleged damages that Ironshore previously claimed were caused by a material breach of the insurance policy by *both* Schiff and its insured, Dorel Juvenile Group, Inc. ("Dorel").  Ironshore's attempt to recover these contract-based damages under a tort theory is barred by the economic loss rule.

Ironshore also cannot prove causation.  Although Ironshore speculates it could have reached a lower settlement before trial in the *Hinson* Case, Texas and Fifth Circuit cases expressly

---

[1] *See* Dkt. 52 (December 8, 2017 Order) at p. 1 ("Ironshore alleges that Schiff 'negligently and falsely misrepresented the facts of the Lawsuit [involving Dorel], its *settlement value*, and the *exposure* it presented to Ironshore's policy.'")  (emphasis added) (*citing* First Amended Complaint ¶ 24).

[2] *See* Ex. A-1 (Enoch Dep.) 59:2-21 (admitting, among other things, that Enoch is "not here expressing an opinion on whether [Schiff was] negligent in their representation of Dorel."); *id*. at 60:15-61:9 (Q: And you're not expressing any opinion that Schiff negligently evaluated or estimated the value of the Hinson case? A: . . .  My concern about Schiff Hardin's – it's not their evaluation of the case. . . .  It's not whether they were negligent in evaluating the case or representing Dorel in the case.") (objection omitted).

[3] *Hinson v. Dorel Juvenile Group, Inc.*, No. 2:15-cv-713 (E.D. Tex. 2016) (the "*Hinson* Case").

reject causation and damages theories based on a hypothetical lost-settlement opportunity requiring negotiations and approvals among multiple parties when, as here, there is no proof directly from ***each*** of those parties to establish the specific amount, terms, effective date, and necessary approvals.  Even Ironshore's corporate representative described as "***speculative***" what might have resulted from hypothetical negotiations with the underlying plaintiffs.[4]  This admission alone mandates summary judgment.  At most, Ironshore would have ***considered trying*** to settle.[5]  Such allegations are insufficient as a matter of Texas law.  *See Rogers v. Zanetti*, 518 S.W.3d 394, 411 (Tex. 2017); *Harrison v. Taft, Stettinius & Hollister, L.L.P.*, 381 Fed. Appx. 432, 436 (5th Cir. 2010).  Moreover, because the applicable insurance policy contained no "hammer clause" and granted Dorel the unfettered right to settle or go to trial, Ironshore had no right to go behind Dorel's back and settle directly with the plaintiffs.

And, Ironshore's latest argument – that its alleged losses resulted from ***Dorel's*** decision and Ironshore's duty to indemnify – negates Ironshore's only pled theory that ***Ironshore*** was forced to settle to avoid a hypothetical, never-entered "disastrous final judgment."

Ultimately, Ironshore's claim fails for lack of evidence on two essential elements: proximate causation and false information, which entitles Schiff to summary judgment.[6]

---

[4] *See* Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) at 156:24 – 157:8 ("Q: So on . . . June 9th, after the two orders were entered, at what price could the Hinson case have been settled?  A:  ***You're asking me to speculate*** on something . . . .  [w]hich would be difficult for me to do . . . .") (emphasis added); *id.* at 163:1-18 ("Q: . . . So if Ironshore had received these two orders on June 9th, 2016, what was it going to do? . . . .  A: Well, I've already said that we would have had an opportunity to settle the claim  . . . .  Q: . . . . [A]nd you don't know what that figure would be that the plaintiffs would have accepted . . . .  A: Well, ***you're . . . speculating*** as to whether they would have accepted and what we would have offered so . . . .") (emphasis added).

[5] *See* Ex. A-3 (Reusch Dep.) at 85:1 – 86:13 (". . . Ironshore was not the beneficiary of [certain] information prior to June 20th, and if Ironshore was aware of the combination of those things, plus some other things that I may be not thinking of at this point in time, Ironshore would have ***definitely considered trying*** to resolve this case instead of allowing it to go to trial – and get to a verdict that resulted.") (emphasis added).

[6] Because Schiff's communications with Ironshore sharing mental impressions and beliefs about case value and potential outcomes were "part" of representing Dorel and not "foreign to the duties of an attorney," *see Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 485 (Tex. 2015), Schiff had no duties to Ironshore and is

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On November 5, 2014, Ironshore issued insurance policy No. PG1420287 (the "Policy") to Dorel, a manufacturer of child car seats.  *See* Ironshore's First Amended Complaint ("Complaint") ¶ 2; *see also* Ex. A-4 (Policy), cover page.  Under the Policy, Ironshore contracted only "[t]o indemnify [Dorel] for Ultimate Net Loss which [Dorel] becomes obligated to pay by reason of liability . . . for Damages on account of . . . Personal Injury . . . caused by an Occurrence . . . ."  *See* Ex. A-4 (Policy) at § I.A.

2.      Ironshore's liability was limited to the amount of Ultimate Net Loss for each covered Occurrence in excess of Dorel's self-insured retention ("SIR"), up to the Policy's Limits of Liability.  *Id.* at §§ II.A, II.B, and p. 1, Item 2.  Ironshore's "Liability under [the] Policy . . . [did] not attach unless and until: (a) [Dorel] . . . paid [its] . . . self-insured retention[] . . .; and (b) [Dorel]'s liability covered [by the Policy] shall have been fixed and rendered certain either by final judgment . . . or *by settlement approved in writing by [Ironshore]*, and [Dorel] shall have paid such judgment or settlement."  *Id.* at § IV.Q.(1) (emphasis added).

3.      Under the Policy, Ironshore could not be "called upon to assume charge of the settlement or defense of any Claim made or suit brought or proceeding instituted against [Dorel]," but Ironshore had "the right . . . to associate with [Dorel] . . . in the defense and control of any Claim . . . [that] involves, or appears reasonably likely to involve, [Ironshore] . . . ."  *See id.* at § IV.D.(1); *see also* Complaint ¶ 21.

4.      The Policy imposed no duty on Dorel to settle, attempt to settle, convey settlement offers, or allow a settlement of the *Hinson* Case within its SIR.  *See* Ex. A-4 (Policy); *see also* Ex.

immune from suit by non-client Ironshore.  *See* Schiff's Motion to Dismiss (Dkt. 17) at pp. 20-30.  This pure question of law – which disposes of the entire case – is not the subject of this Motion.

A-5 (Michelle Anderson Email to Gillian Barnes) ("The policy allows [Dorel] to deal with each matter as they see fit within the SIR."); Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) 23:19-24 (Dorel had no obligation to disclose settlement offers to Ironshore).

5.      The Policy has no "hammer clause" or other contract provision authorizing Ironshore to demand that Dorel settle a claim against Dorel.[7]

6.      On May 13, 2015, a mother, father, and minor child sued Dorel in this Court, seeking actual and exemplary damages based on Dorel's alleged failure to warn that its forward-facing child car seat was unreasonably dangerous for children under age 2, which allegedly caused the child to suffer a spinal injury in an automobile collision.  *See Hinson* Case Dkt. 1; *see also* Complaint ¶ 13.[8]  On April 1, 2016, the Hinson plaintiffs amended their claims to allege that the child also suffered a brain injury.  *See Hinson* Case Dkt. 41.

7.      Dorel retained Schiff as defense counsel in the *Hinson* Case and Schiff never withdrew from the case.  Complaint ¶ 14; *see also Hinson* Case Dkts. 4 & 46.

8.      Schiff did not represent Ironshore in connection with the *Hinson* Case and never had an attorney-client relationship with Ironshore.[9]  Schiff communicated with Ironshore about the *Hinson* Case on behalf of Dorel.  Ironshore admits that during a face-to-face meeting, Schiff

---

[7] *See* Ex. A-4 (Policy); Ex. A-6 (Anderson Dep.) at 225:24-226:7 ("Q:  So when you say you could not have made Dorel settle, that's because the insurance policy did not permit Ironshore to force Dorel to agree to any particular settlement amount, correct?  A:  That's true.  There's no hammer clause in the policy . . . ."); Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) at 41:4-8 ("Q: [T]here wasn't a hammer clause in the policy that covered the Hinson claim, was there?  A: There was no hammer clause in . . . that policy.").  The Policy also has no clause authorizing Ironshore independently to settle a claim against Dorel.  *See* Ex. A-4 (Policy).

[8] The Court can take judicial notice of the contents of filings in this case and the *Hinson* Case, and Schiff respectfully requests that the Court take such notice of the filings cited herein under FED. R. EVID. 201. *See, e.g., Hall v. United States*, No. 6:06-CV-528, 2008 WL 276397, at *2-3 (E.D. Tex. Jan. 30, 2008).

[9] *See* Ex. A-3 (Reusch Dep.) at 191:15-16 ("Q: Ironshore . . . did not retain Schiff?  A: Ironshore did not retain Schiff, I agree."); *id*. at 192:3-9 ("Q: . . . [D]o you agree that there was no attorney-client relationship between Schiff and Ironshore as Mr. Mitrovic notes here?  A: Yeah, there was no direct attorney-client relationship . . . as Mr. Mitrovic represents.").

partner (who also was Dorel's General Counsel) Bruce Weisenthal told Ironshore's claim adjuster, Michelle Anderson, to read Schiff's litigation updates "as if they were for [Schiff's] client [Dorel], not insurers [Ironshore]."  *See* Ex. A-7 (Michelle Anderson Email to Mark Hill).

9.      During the *Hinson* Case, Ironshore never asked to receive copies of pleadings, motions, and orders.  *See* Ex. A-6 (Anderson Dep) at 204:17-21.

10.     On June 13, 2016, the *Hinson* trial began.  On June 17, 2016, the jury in the *Hinson* Case returned an approximately $34 million verdict (approximately $24 million in actual and $10 million in punitive damages).  *See* Complaint ¶ 46; *see also Hinson* Case Dkts. 166 & 167.

11.     On June 28, 2016, this Court entered a Judgment in the *Hinson* Case, then *sua sponte* vacated that Judgment on June 30, 2016 and ordered the parties, including Ironshore, to attend post-verdict mediation.  *Hinson* Case Dkts. 172 & 175.

12.     The Policy provides that, "[i]n the event [Dorel] . . . elect[s] not to appeal a judgment in excess of the retention, . . . [Ironshore] may elect to make such appeal at its own cost and expense . . . ."  *See* Ex. A-4 (Policy) at § IV.A.

13.     Shortly after the verdict, Ironshore retained Wilson Elser Moskowitz Edelman & Dicker LLP ("Wilson Elser") as coverage counsel for the *Hinson* Case.  On July 18, 2016, Wilson Elser sent a letter to ***both*** Dorel and Schiff asserting that, despite Ironshore's requests throughout the *Hinson* Case, ***both*** Dorel and Schiff had ***failed to provide***:

- "a ***complete analysis*** by Schiff Hardin of the ***liability and damages*** issues;"
- "pre-mediation and pre-trial reports;" and
- "any ***substantive analysis*** of investigations conducted on the car seat, Dorel's ***liability, exposure***, potential ***defenses***, the claimed ***damages, settlement opportunities***, and trial ***strategy*** . . . ."

*See* Ex. A-8 at p. 5 (emphasis added).  Wilson Elser argued that Dorel and Schiff's conduct collectively "failed to comply with" and "constitute[d] a ***material breach of the Policy's***

*assistance and cooperation condition*." *See id.* (emphasis added); *see also* Ex. A-4 (Policy) at §

IV.D.  On Ironshore's behalf, Wilson Elser demanded that *both* Dorel and Schiff:

- "*consult and coordinate* with Ironshore *on any decisions* pertaining to the ongoing defense of the Lawsuit, including consideration of any settlement opportunities and whether to pursue an appeal;"

- "promptly furnish any and *all information* reasonably requested by Ironshore with respect to the Lawsuit;"

- "consult and coordinate with Ironshore regarding *strategy for the mediation*;"

- "consult with Ironshore on any *efforts to overturn the verdict/judgment* including the *decision whether to appeal*;" and

- "notify Ironshore immediately if [Dorel] decides not to appeal, so that Ironshore has sufficient time to exercise its [independent appellate] rights under [Policy § IV.A]."

*See* Ex. A-8 (Wilson Elser Letter) at pp. 2, 5, 6 (emphasis added).

14.    Shortly after the verdict, Ironshore retained Jeffrey Parsons as monitoring counsel

for the *Hinson* Case.[10]  Parsons and his firm continue to represent Ironshore in this case.

15.    In a series of post-trial emails, Parsons opined that there was insufficient evidence

to support the jury's verdict and that post-trial or appellate remedies had merit.  For example, on

July 15, 2016, Parsons stated the following in an email to Schiff's lead trial counsel Jonathan

Judge:

> From my review of the [Hinson trial] transcripts thus far, I cannot find any evidence offered by plaintiff to support the proposition that the seat was unreasonably dangerous . . . . [t]hus I am wondering whether Plaintiff actually met i[t]s burden of proof or whether there is insufficient evidence to support the jury's verdict.[11]

16.    Ten days later, on July 25, Parsons again emailed Mr. Judge, stating, among other

things, that:

---

[10] Until mid-2016, Parsons practiced at Beirne, Maynard & Parsons, LLP, and thereafter he has practiced at Parsons McEntire McCleary & Clark PLLC.  This motion refers to Parsons and these firms, collectively, as "Parsons."

[11] *See* Ex. A-9.

> Three factors ensure that this case will receive great scrutiny at the Fifth Circuit:  a) the very large judgment; b) the big punitive damages award; and c) Plaintiff's novel theory of liability lacking viable evidentiary support.  Plaintiff's case at trial rested solely upon Plaintiff's unsupported claim that Dorel's front-facing child car seat was unreasonably dangerous without the warning suggested by Plaintiff counsel - - no child under age 2 should use the seat.
>
> Plaintiff's novel liability claim stands in stark contrast to the trial record . . . .[12]

17.     The post-verdict mediation occurred on July 27, 2016.  *See Hinson* Case Dkt. 188. Ironshore attended that mediation, along with Dorel and Schiff.  *See id.*; Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) at 12:19-25.

18.     Neither Ironshore nor Dorel filed post-trial motions asking this Court to reject or reduce the *Hinson* verdict.  Neither Ironshore nor Dorel filed an appeal in the *Hinson* Case.

19.     The *Hinson* Case ultimately settled with Dorel paying its SIR and Ironshore contractually indemnifying Dorel for the remainder of the settlement.  *See* Complaint ¶ 47.

## II.     IRONSHORE HAS NO EVIDENCE ON PROXIMATE CAUSE, WHICH ENTITLES SCHIFF TO JUDGMENT AS A MATTER OF LAW.

Ironshore alleges a cause of action for negligent misrepresentation, which "requires proof that: (1) the defendant in the course of his business or a transaction in which he had an interest; (2) supplied ***false information*** for the guidance of others; (3) ***without exercising reasonable care*** or competence in communicating the information; (4) the plaintiff justifiably relied on the information; (5) ***proximately causing the plaintiff's injury***."  *Kastner v. Jenkens & Gilchrist, P.C.,* 231 S.W.3d 571, 577 (Tex. App.—Dallas 2007, no pet.) (emphasis added).[13]

---

[12] *See* Ex. A-10.

[13] Ironshore's Complaint also contains a heading titled "Gross Negligence and Exemplary Damages" on p. 11, which does not appear to be a separate cause of action.  In any event, a gross negligence claim fails without proof of ordinary negligence, which Ironshore lacks as shown in this motion.  *See Taylor v. Alonso, Cersonsky & Garcia, P.C.,* 395 S.W.3d 178, 188 (Tex. App.—Houston [1st Dist.] 2012, no pet.).  Gross negligence also requires evidence "that the defendant . . . consciously disregarded the safety of the plaintiff . . . creat[ing] an extreme degree of risk."  *Shell Oil Co. v. Humphrey,* 880 S.W.2d 170, 174 (Tex. App.—

As the Texas Supreme Court explained in *Alexander v. Turtur & Assoc., Inc.*, "[b]reach of the standard of care and causation are separate inquiries . . . and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other."  146 S.W.3d 113, 119 (Tex. 2004).   Here, although Ironshore asserts a series of supposed breaches of a non-existent overreaching standard of care that would subject Texas attorneys to liability for routine communications with their clients' insurers,[14] it has no evidence to raise a fact issue on the element of proximate causation, so none of Ironshore's complaints about the information it allegedly received or did not receive from Schiff – even if proven – can prevent summary judgment.[15]

Ironshore has no evidence that Schiff proximately caused it any injury because: (a) Ironshore has no evidence that it was "compelled to settle" the *Hinson* Case to avoid what Ironshore speculates would have been a "disastrous" final judgment (which this Court never entered); (b) Ironshore had no right to settle the *Hinson* Case behind Dorel's back or to force Dorel to settle within its SIR; and (c) Ironshore cannot meet its burden to prove that a lower settlement actually would have occurred if Schiff had provided different or additional information.

---

Houston [14th Dist.] 1994, writ denied).  Ironshore has no such evidence, and Schiff is entitled to summary judgment on any gross negligence claim.

[14] Such insured-insurer communications from an insured's attorneys about pending suits and claims are so routinely part of an attorney's representation of a client that they are protected as work product.  *See* TEX. R. CIV. P. 192.5(a) ("Work Product" includes "communication[s]" with the client party's "sureties, indemnitors, [and] insurers."); FED. R. CIV. P. 26(b)(3)(A).

[15] Proximate cause requires both cause-in-fact and foreseeability.  Cause in fact requires: (1) that the negligence was "a substantial factor in bringing about the harm", (2) "'but for' [which], the harm would not have occurred."  *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016).  A mere showing that the negligence created the condition making the harm possible is insufficient to prove it was a substantial factor in causing the harm.  *Id*.  Foreseeability requires that "a person of ordinary intelligence should have anticipated the danger" created by the negligence.  *Id*.  Ironshore cannot meet any of these elements.

### A.     There is no evidence that Ironshore was "compelled" to settle the *Hinson* Case to avoid a hypothetical, never-entered "disastrous final judgment."

Ironshore's Complaint alleges that "[t]o avoid a disastrous final judgment, Ironshore was compelled to settle the [*Hinson*] case and funded the vast majority of the settlement."  Complaint ¶ 47.  But any theory that Ironshore was "compelled to settle" fails as a matter of law under the unambiguous Policy language giving Ironshore: (1) an independent ***right to appeal*** any judgment in excess of the SIR – without Dorel's consent, and (2) a ***right to disapprove any settlement*** proposed by Dorel for an amount greater than Dorel's SIR.  Facts ¶¶ 2, 12.[16]

After the Court vacated its initial judgment *sua sponte*, Ironshore could have declined to approve any settlement that would require a contribution from Ironshore.  Ironshore also could have waited for a new judgment to be entered and then, *if* that judgment was in excess of the SIR, filed an appeal.  *See* Facts ¶¶ 2, 11, 12.  But, because the *Hinson* Case settled before the Court entered a new judgment, Ironshore can only speculate that a new judgment (if any) would have been entered for more than the SIR.  *See* Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) 134:19-136:14 (Ironshore admits it does not know whether the Court would have reduced the jury's award or ordered a new trial, and does not know what the final judgment amount would have been.).

Indeed, when told that the Court had vacated its initial judgment, Ironshore's only purported attorney-expert, Craig Enoch, admitted that he "ha[d] no knowledge of what the status of the judgment was at the time of the [post-verdict] mediation."  *See* Ex. A-1 (Enoch Dep.) at 143:1-6.  And, as explained in Schiff's motion to exclude Enoch's testimony, Enoch did not independently evaluate the post-trial or appellate arguments Dorel and Ironshore could have raised,

---

[16] *See Town of Harrison v. Nat'l Union Fire Ins. Co.*, 675 N.E.2d 829, 832 (N.Y. 1996) ("Where the terms of an insurance policy are clear and unambiguous, [their] interpretation . . . is a matter of law for the court.").

so he cannot reliably opine about their likelihood of success.[17]  There is simply no evidence that Ironshore was forced, obligated, or compelled to settle.  Instead, the evidence shows that Ironshore chose not to object to the settlement or appeal.  Thus, Ironshore's "compelled settlement" causation theory fails as a matter of law for lack of evidence.

Ironshore's contention that something "compelled" it to settle for a specific reason – to avoid a final judgment – also places at issue all facts and circumstances (including legal advice, if any) that Ironshore considered in deciding to settle.  Ironshore appears to have received and relied upon legal advice on whether to settle from both Parsons and Wilson Elser.[18]  But Ironshore improperly has refused discovery into these matters.  *See* Dkt. 48 (Schiff's Motion to Compel, which asserts that Ironshore has waived any privilege with respect to Parsons and Wilson Elser's legal advice that Ironshore considered in entering into the settlement).  Because Ironshore has withheld evidence regarding key facts that it considered in deciding whether to settle or appeal (Parsons' and Wilson Elser's advice), it is precluded from offering any evidence to support its contention that it was damaged by a purportedly "compelled" settlement.[19]

Recognizing that its original compelled-settlement theory is unsupported by the evidence and waives privilege for settlement-related legal advice, Ironshore recently adopted a contract-

---

[17] *See* Schiff's Motion to Exclude Plaintiff's Purported Standard-of-Care and Settlement Expert Craig Enoch, at pp. 13-15.

[18] *See* Facts ¶¶ 13-16; *see also* Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) at 138:16-141:13 (admitting that Ironshore's settlement was "based on our legal  . . . assessment" and reliance on lawyers, but refusing to disclose that advice); 146:8-147:13 (refusing to disclose whether legal advice led Ironshore to settle instead of appealing).

[19] *See Mobile Telecom. Techs., LLC v. ZTE (USA) Inc.*, No. 2:13-CV-946, 2016 WL 8260584, at *3 (E.D. Tex. July 22, 2016) (Gilstrap, J.) (granting motion in limine forbidding the parties from introducing evidence or argument "regarding any subject matter previously withheld under a claim o[f] attorney-client privilege, work product immunity, and/or any other applicable claim of privilege"); *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-CV-461, 2016 WL 2997120, at *9 (E.D. Tex. May 24, 2016) (testimony by a corporate representative "bind[s] the corporation to the deponent's answers.").

based theory of how it purportedly was "compelled to settle," which admits that "Ironshore had neither the contractual right, nor factually, the power to force Dorel to participate in the settlement." *See* Ex. A-11 (Enoch Rebuttal Report) at 1;[20] *see also* Dkt. 57 (Ironshore's Response Opposing Schiff's Motion to Compel) at p. 1 (denying "that Ironshore controlled Dorel's settlement of the Hinson [Case]").[21]  Under this theory, in which Ironshore merely was a passenger along for the ride with Dorel in the settlement driver's seat, "Ironshore was compelled to settle, but that was because Ironshore was obligated to indemnify Dorel for the part of the settlement agreement over [the SIR]."  Ex. A-11 (Enoch Rebuttal Report) at 2 (repeatedly insisting that "Dorel, not Ironshore, settled the Hinson lawsuit.").   Ironshore's new theory ***negates*** any contention that "***Ironshore*** was compelled to settle" to "avoid a disastrous final judgment," because Ironshore now insists that ***Dorel*** made the settlement decision and that Ironshore's settlement funding was simply a matter of contract.[22]

> **B.     Ironshore had no contractual right to settle the *Hinson* Case behind Dorel's back or over its objection – only the obligation to indemnify Dorel under the Policy – and Dorel had no duty to seek or allow a settlement.**

Ironshore erroneously insists that it had its own, independent right to settle the *Hinson* Case behind Dorel's back or over its objection at some undetermined time before the adverse verdict. In support, Ironshore alleges that:

> Had Schiff timely reported [an alleged] settlement offer and apprised Ironshore of the true facts related to the case, ***Ironshore would have exercised its right to settle***

---

[20] By citing various admissions and statements by Ironshore's purported experts, Schiff does not accede to the admissibility of any opinion testimony from such experts, which Schiff respectfully urges the Court to exclude for the reasons stated in its separate motions to exclude such testimony.

[21] *See also id.* at 5 (arguing that "Dorel's independent decision to participate in a settlement resided only with Dorel, and Ironshore then became obligated to indemnify Dorel for all sums over the [SIR]"); Ex. A-2 (Ironshore Rule 30(b)(6) Dep.) 130:3-16 (repeatedly testifying that "[i]t was Dorel that settled the case with the plaintiffs"); *id.* at 137:25-138:7 ("Q. . . . So  . . . who made the ultimate decision on behalf of Ironshore to pay [the settlement amount]?  A. Well, it was Dorel that actually made the settlement . . . .").

[22] As explained in Section II.D, Ironshore's new theory also bars any negligent misrepresentation claim against Schiff under the economic loss rule, as a matter of law.

the case.  **Had Dorel declined to accept** the settlement and fund the settlement, Ironshore would have exercised its right to protect its own economic interests.  In that regard, **Ironshore would have paid the Plaintiffs to release all claims**, and Ironshore would have reserved its right to **pursue recovery of the settlement payment from Dorel**, the primary obligor.

Complaint ¶ 49 (emphasis added); *see also id*. at ¶ 48 (alleging, "[u]pon information and belief"

that the *Hinson* "plaintiffs actually would have settled for less [than $3.25 million] before trial").

As explained more fully in Section II.C, this theory requires Ironshore to prove that, if Schiff had acted differently, the *Hinson* Case would have settled on some uncertain date before the verdict for a specific amount lower than the actual settlement.  But Ironshore faces two threshold problems that are equally fatal, as a matter of law: (1) **Ironshore had no right** to settle without Dorel's consent, and (2) **Dorel had no duty** to settle or allow a settlement.[23]

The Policy did not give Ironshore the right to settle without Dorel's consent.  In *Sutton v. Bernard*, No. 00-C-6676, 2002 WL 1794048 (N.D. Ill. Aug. 5, 2002), for example, plaintiffs sought court approval for a settlement reached with an insurance carrier over the insured-defendants' objection.  *Id*. at *1.  The court denied approval, explaining that a carrier's right to "associate . . . in the defense of claims" "does not provide that the insurer has the right to settle over the insured's objections."  *Id*.  The court further noted that the applicable policy – like the Policy here – had no "hammer clause" permitting the insurer to "make any settlement of a claim it deemed expedient with respect to the insured, subject to the insured's written consent," and accordingly found that the insurer **did not** have the right to settle claims **without** the insured's consent.  *Id*. at *2.[24]  Likewise, in *Saucedo v. Winger*, the Kansas Court of Appeals reversed the

---

[23] Ironshore also lacks evidence that there would have been some specific lower settlement, which its corporate representative concedes would be "***speculative***."  *See* n.4 above and Section II.C below.

[24] Some "hammer clauses" are even more favorable to insurers than what the *Sutton* court described.  For instance, a clause authorizing an insurer to "make such investigation and settlement of any claim or suit as it deems expedient" empowers the insurer to settle a case even without the insured's knowledge or consent.

trial court's approval of an insurer's settlement, holding that the insured's consent was required. 915 P.2d 129, 136 (Kan. Ct. App. 1996) (policies without express rights for the insurer to settle "must be interpreted to mean that [the insurer] ***cannot*** settle for less than the policy limits without the consent of defendant.") (emphasis added).

As noted above, the Ironshore policy had no hammer clause.  *See* Facts ¶ 5; *see also* Policy § IV.D.(1) (giving Ironshore only the "opportunity to associate" with Dorel on certain claims).[25] Thus, Ironshore lacked any right to settle without Dorel's consent, and its lost-settlement-opportunity causation theory fails because it expressly presumes that Ironshore had a "right to settle" even if "Dorel declined to accept."[26]

Moreover, the Policy imposed no contractual duty on Dorel to settle, attempt to settle, convey settlement offers, or allow a settlement of the *Hinson* Case and gave Dorel unfettered discretion over claims within its SIR.  *See* Facts ¶ 4.  As the court held in *Forest Ins., Ltd. v. Am. Motorists Ins. Co.*, No. 89-Civ-4326, 1994 WL 97138 (S.D.N.Y. Mar. 21, 1994), if a primary insurer owes no "contractual duty . . . to [the insured] to attempt to negotiate a settlement," then "as a matter of law there could be no cause of action in favor of [the excess insurer against the primary carrier] for breach of a direct duty to settle or for wrongful refusal to settle."  *Id.* at *11. Under the same rule, the excess carrier here (Ironshore) has no cause of action against Dorel (which

---

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Jay Tee Equities Co.*, 628 N.Y.S.2d 765, 766 (N.Y. App. Div. 1995).  The Ironshore Policy has no such clause.  Facts ¶ 5.

[25] Ironshore claims that it never associated in the *Hinson* Case.  *See* Complaint ¶ 22.

[26] *See* Complaint ¶ 49; *see also New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 127 (2d Cir. 2010) (interpreting language identical to Policy IV.D(1), and holding that it "simply allows for the excess insurers to associate with either [the primary insurer] or [the insured], or both, in the defense of qualifying claims, and otherwise requires cooperation among all parties in the common goal of defense"); *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 594 N.E.2d 571, 575 (N.Y. 1992) (holding that "[t]he 'right to associate' involves the right to consult with and advise the []insured in its handling of a claim" and has "critical distinctions [from] a primary insurer's right to control the investigation and defense of a claim").

self-insured its primary risk layer) for failure to settle, and Ironshore could not compel Dorel to settle.[27]  In fact, Ironshore's own purported expert, Enoch, admits that "Ironshore had neither the contractual right, nor factually, the power to force Dorel to participate in the settlement."[28]  Thus, any evidence of alleged settlement offers from the *Hinson* plaintiffs that were within Dorel's SIR is irrelevant without evidence that Dorel was willing to accept – and there is none.[29]

Ultimately, there is no evidence to support Ironshore's theory that it could have settled – or forced Dorel to settle – the *Hinson* Case without Dorel's consent, because Ironshore did not have that right as a matter of law.

> **C.      Ironshore admits that any pre-trial settlement it might have tried to negotiate over Dorel's objection would be "speculative," and it cannot show that each of the multiple necessary parties actually would have settled the *Hinson* Case for a certain amount, on a certain date, on specific terms, but for Schiff's alleged conduct.**

Even if Ironshore had the legal right to settle with the *Hinson* plaintiffs without Dorel's consent (which Schiff denies), Ironshore still must prove that, ***but for*** Schiff's alleged conduct: (1) the Hinson plaintiffs and their attorneys would have accepted a specific settlement offer, on certain terms, on a specific date, (2) the guardian *ad litem* would have approved that purportedly lower

---

[27] *See, e.g.*, *Employers Mut. Cas. Co. v. Key Pharmaceuticals, Inc.*, 871 F. Supp. 657, 665 (S.D.N.Y. 1994) (noting that every court in the country to address the question has "rejected the argument that a policyholder owes a common-law duty to its excess insurer to attempt to settle a lawsuit at a point below the threshold of the excess insurance").

[28] *See* Ex. A-11 (Enoch Rebuttal Report) at 1; *see also* Ex. A-12  (Enoch Report) at 10 n.3; Ex. A-1 (Enoch Dep.) at 191:3-9.

[29] Ironshore's suggestion that it could have settled the *Hinson* Case and then "pursue[d] recovery of the settlement payment from Dorel, the primary obligor" is equally wrong as a matter of law, because Dorel ***had*** no "primary obli[gation]" to settle claims.  *See id.* at 192:19-193:3 (admitting that Ironshore had no right to seek reimbursement from Dorel if the case settled within Dorel's self-insured retention); *see also* Facts ¶¶ 2,5 and n.7 (Policy created an obligation for Ironshore only to "indemnify [Dorel]" for covered Ultimate Net Loss, without authorizing Ironshore to compensate plaintiffs directly and then seek recovery from Dorel); Ex. A-11 (Enoch Rebuttal Report) at p. 2 ("Dorel's policy with Ironshore was an indemnity contract."); Ex. A-13 (Ironshore email showing that Ironshore refused to pay the plaintiffs directly based on this same language.).

settlement,[30] and (3) the Court would have approved it as well.[31]  "In other words, [Ironshore's] causation evidence depend[s] upon how third parties would react under different hypothetical circumstances."  *See Axcess Int'l, Inc. v. Baker Botts, L.L.P.*, No. 05-14-01151-CV, 2016 WL 1162208, at *5 (Tex. App.—Dallas Mar. 24, 2016, pet. denied) (affirming judgment as a matter of law finding no causation).

Under a long line of Texas cases, Ironshore must "prove—not just suggest or theorize, but prove with competent, non-speculative evidence—that the third parties *would* have actually taken" different actions if Schiff had acted differently.  *Id*. (emphasis in original, citing cases).  For example, in *Axcess*, plaintiff argued that if the defendant had disclosed certain facts, plaintiff would have: (1) hired other counsel, (2) instituted a patent-interference proceeding, and (3) used the interference proceeding's existence or favorable outcome to negotiate a business solution with the alleged patent infringer.  *Id*. at *4-5.  Ironshore similarly alleges that, if Schiff had disclosed certain adverse rulings in the *Hinson* Case before trial and made other disclosures, Ironshore would have hired counsel, had them communicate with the Hinsons' attorneys, negotiated behind Dorel's back over its objection, then settled the case for a lower price while preparing to try the case which Dorel insisted proceed to trial.  Complaint ¶¶ 47-49.

But the expert testimony in *Axcess* was speculative and insufficient to prove causation because the experts "in no way [could] establish[] what a third-party body, the panel of . . . patent judges, would have actually concluded" in an interference proceeding and could only speculate that the infringer would have entered into a favorable business agreement with the plaintiff.  *Id*. at *5-7.  Ironshore's hypothetical settlement theory likewise fails for lack of causation, because

---

[30] *See* Hinson Case Dkt. 191 (Order Appointing Guardian *Ad Litem*).

[31] *See* Hinson Case Dkt. 199 (Sealed Order Approving Settlement).

Ironshore lacks competent evidence that the Hinson plaintiffs, their attorneys, and the guardian *ad litem* each ***actually would have*** agreed to – and this Court would have approved – a lower settlement for a specific amount at a particular time if Schiff had done something differently.  Even Ironshore's corporate representative admits in binding testimony that this would be "***speculative***." *See* n. 4 above.  This alone dooms Ironshore's claim.  Ironshore simply has Enoch's irrelevant and unreliable opinion that the actual settlement was "reasonable,"[32] and non-attorney Peter Stow's speculation that Ironshore would have hired counsel and ***tried*** to settle on better terms if Schiff had provided different or additional information.[33]  Neither is admissible, among other reasons because causation requires competent evidence ***from the relevant third parties*** that they ***actually*** would have behaved differently but for the defendant's negligence.  *See Axcess,* 2016 WL 1162208, at *5.  The causation standard in *Axcess* is consistent with many other cases, several of which *Axcess* cites:

- *Taylor v. Alonso, Cersonsky & Garcia, P.C.*, 395 S.W.3d 178, 188 n.5 (Tex. App.— Houston [1st Dist.] 2012, no pet.) (expert opinion that "proper handling of the case" would have resulted in a lower settlement was insufficient to prevent summary judgment without evidence that the underlying plaintiff actually would have accepted a lower amount);

- *Thompson & Knight LLP v. Patriot Expl., LLC*, 444 S.W.3d 157, 167 (Tex. App.— Dallas 2014, no pet.) (plaintiff's expert opinion that transaction would have closed at a higher price but for attorney's negligence was legally insufficient without evidence that anyone "would have actually paid that amount for the property");

- *Tolpo v. Decordova*, 146 S.W.3d 678, 684 (Tex. App.—Beaumont 2004, no pet.) (without evidence that counterparty would have agreed to a desired term in a contract, plaintiff could not establish causation in negligence case faulting his attorney for failing to include such term);[34]

---

[32] *See* Schiff's Motion to Exclude Plaintiff's Purported Standard-of-Care and Settlement Expert Craig Enoch at 7-15.

[33] *See* Schiff's Motion to Exclude Plaintiff's Purported Causation and Insurance Expert Peter Stow.

[34] *See also Pierre v. Steinbach*, 378 S.W.3d 529, 535 (Tex. App.—Dallas 2012, no pet.) (It would require "impermissible inference stacking" to suppose that, given different advice: (1) client would have insisted

- *Keck, Mahin & Cate v. Nat. Union Fire Ins. Co.*, 20 S.W.3d 692, 703 (Tex. 2000) ("Even if [plaintiff] can prove that its settlement was excessive, it must also prove that [defense attorney] mishandled the defense and that a judgment for [the underlying plaintiff] in excess of the case's true value would have resulted from [defense attorney's malpractice].");[35]

- *HMC Hotel Properties II Ltd. P'ship v. Keystone-Texas Prop. Holding Corp.*, 439 S.W.3d 910, 916-17 (Tex. 2014) (evidence that parties explored a course of action is not evidence that such course of action "was ever truly possible;" the relevant question for causation is what the parties ***would*** have done, not what they ***could*** have done);

- *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 277-79 (5th Cir. 2009) (affirming summary judgment for defendant and exclusion of plaintiff's expert who would have testified that "but for" the defendant's breach of a confidentiality agreement, plaintiff and defendant would have agreed to an ongoing licensing agreement, holding that the exclusion was proper because a "hypothetical licensing agreement based on speculation and conjecture cannot be said to reliably measure [plaintiff's] actual loss");

- *Formosa Plastics Corp. USA v. Presidio Eng'rs. and Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (rejecting lost profits damages based upon a hypothetical higher bid because there was no evidence the higher bid would have been accepted);

- *Hebert Acquisitions, LLC v. Tremur Consulting Contractors, Inc.*, No. 03-09-00385-CV, 2011 WL 350466, at *5 (Tex. App.—Austin Feb. 4, 2011, no pet.) (rejecting damages based upon a hypothetical lower bid, because there was no evidence the lower bid would have been accepted); and

- *Burrow v. Arce*, 997 S.W.2d 229, 236-37 (Tex. 1999) (rejecting, as conclusory, experts' affidavit testimony that settlements were "fair and reasonable").

---

on better term, (2) opposing party would have accepted such term, and (3) opposing party would not have modified its behavior in light of the different term.); *Harrison*, 381 Fed. Appx. at 436 (client failed to prove causation in case against attorney because there was no evidence the counterparty would have accepted a more advantageous contract term; client's expert could only speculate that the desired clause would have made a difference in a third-party's behavior); *Rogers*, 518 S.W.3d at 411 (evidence of settlement offer was insufficient to raise a fact issue on causation, even where that offer was not conveyed to the client and the client testified he would have tried to settle with the plaintiff if he knew about the offer).

[35] In *Keck*, the plaintiff excess carrier argued that it paid an inflated settlement because the insured's defense counsel had prepared a negligent defense that made trying the case to verdict unreasonably risky. *Id*. For the same reason that the *Keck* plaintiff was required to provide expert testimony that the trial actually would have resulted it in a worse outcome than the settlement (through a judgment in excess of the case's malpractice-free "true value"), Ironshore must prove that different conduct by Schiff would actually have resulted in a lower settlement accepted by the Hinson plaintiffs, the guardian *ad litem*, and the Court. *See id*. Yet, Ironshore has no such competent expert proof.

Relatedly, the Texas Supreme Court has rejected – as inconsistent with the but-for causation requirement – any variant of the "loss of chance" doctrine, under which some states allow medical malpractice plaintiffs to establish causation by showing that the physician's negligence reduced their chances of recovery, even if the same harm was more likely than not to have occurred without the negligence. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400, 405 (Tex. 1993).  As the Court explained, adopting such a doctrine as Texas common law would result in the untenable result that:

> If, for example, a disgruntled or unsuccessful litigant loses a case that he or she had a less than 50 percent chance of winning, but is able to adduce expert testimony that his or her lawyer negligently reduced this chance by some degree, the litigant would be able to pursue a cause of action for malpractice under the loss of chance doctrine.

*Id.* at 406.[36]  Requiring Ironshore to prove anything less than that each of the relevant third parties actually would have approved a specific lower settlement, on a particular date, on certain terms, but for Schiff's alleged negligence would amount to an adoption of the "loss of chance" doctrine that the Supreme Court rejected.  Accordingly, because Ironshore lacks evidence that a lower settlement actually would have occurred with different conduct by Schiff, Ironshore cannot raise a fact issue on causation and its negligent misrepresentation claim fails as a matter of law.

### D.    Ironshore's theories of recovery based on contractually indemnifying Dorel under the Policy are barred under the economic loss rule.

As noted above, Ironshore's latest (albeit unpled) formulation of its causation theory is that its indemnification obligations under the Policy "compelled" it to settle the *Hinson* Case. Ironshore's purported expert Enoch summarized Ironshore's position as follows:

---

[36] *See also Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld, L.L.P.*, 504 F.3d 1262, 1270-71 (Fed. Cir. 2007) (under Texas law, plaintiff's theory that attorney's negligence diminished his claims' settlement value was insufficient to establish causation without also proving that the plaintiff "would have been successful in the underlying litigation but for the [attorney's] alleged errors").

> Ironshore did not 'decide' to settle the Hinson lawsuit or 'unilaterally decide' to pay the Hinsons without affording Dorel an opportunity to assert any arguments 'to reverse or reduce the judgment.'  ***Dorel made its own decisions*** in this regard.  ***Dorel settled*** the Hinson lawsuit and paid the full amount of the settlement.  ***And*** under the terms of the . . . Policy, ***Ironshore was contractually required to indemnify*** Dorel.[37]

Ironshore's contention that ***Dorel*** settled the *Hinson* Case and that Ironshore was merely contractually required to indemnify Dorel negates and conclusively disproves its only-pled theory that ***Ironshore*** itself was "compelled to settle" to avoid what it speculates would have been "a disastrous final judgment."  *See* Complaint ¶ 47.  But it also highlights that Ironshore's damage theory runs headfirst into Texas's economic loss rule, because it attempts to burden Schiff with the consequences of Ironshore's performance under the Policy between Ironshore and Dorel.

> Under the economic loss rule, if a plaintiff only seeks to recover for the loss or damage to the subject matter of a contract, he cannot maintain a tort action against a defendant.  Simply stated, under the economic loss rule, a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim

*Sterling Chem., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (internal citation omitted).  *See also id.* at 797 ("Texas courts have applied the economic loss rule to preclude tort claims between parties who are not in contractual privity.").

In *Sterling*, plaintiff Sterling contracted for raw materials from one company (PHS), while knowing that PHS would rely upon services from a third party (Texaco), in order to perform.  *Id.* at 795.  Sterling argued that Texaco negligently misrepresented its technology during meetings with Sterling, which induced Sterling to contract with PHS.  *Id.*  When PHS breached by interrupting service, Sterling sued Texaco.  *Id.* at 796.  But the court affirmed summary judgment based on the economic loss rule, holding that "a plaintiff may not bring a claim for negligent

---

[37] *See* Ex. A-11 (Enoch Rebuttal Report) at 3.

misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Id*. at 797.  Put another way, a contracting party cannot recover the benefit of its contractual bargain with one party by suing a third-party in tort.  *Id*. at 797-800 (explaining that permitting such suits would disrupt the parties' contractual risk allocations, and further holding that benefit-of-the-bargain damages are not recoverable under a negligent misrepresentation claim).

Here, Wilson Elser's letter admits that Dorel's and Schiff's failure to provide information to Ironshore during the *Hinson* Case was a "***material breach*** of the Policy's assistance and cooperation condition." Facts ¶ 13.[38]  Under the rule in *Sterling*, Ironshore cannot indemnify Dorel under the Policy, then recover the benefit of its materially-breached bargain with Dorel by suing Schiff in tort.  *See* 259 S.W.3d at 798 (disallowing tort recovery from Texaco because it sought "the same measure of damages available for a breach of contract").

The economic loss rule "reflects a preference for allocating some economic risks by contract rather than by law" *See LAN/STV v. Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 235 (Tex. 2014).  In *Eby*, for example, the Texas Supreme Court held that, because construction projects "operate by agreements among the participants," "one participant on a construction project cannot recover from another . . . for economic loss caused by negligence" without a contract between them creating such liability.  *See id*. at 245-46.  The attorney-client-insurer context is akin

---

[38] Under Texas law, a prior material breach by one contracting party excuses performance by the other party. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004).  Ironshore thus was excused from performance under the Policy according to its own counsel, Wilson Elser.  But, after reserving rights to deny coverage or indemnification, Ironshore voluntarily waived Dorel's alleged breach of contract and indemnified Dorel for a substantial part of the *Hinson* settlement.  *See* Ex. A-8 at p. ; Facts ¶ 19.

to a construction project in that it is characterized by a "web of contracts."[39] "The attorney-client relationship is a contractual relationship whereby an attorney agrees to render professional services for a client." *Gillis v. Provost & Umphrey Law Firm, LLP*, No. 05-13-00892-CV, 2015 WL 170240, at *10 (Tex. App.—Dallas Jan. 14, 2015, no pet.). And the insured-insurer relationship also is contractual, as evidenced by the lengthy and complex Policy between Ironshore and Dorel. Schiff is not a party to that contract, yet Ironshore claims that the information Schiff provided or omitted to provide to Ironshore during the course of Schiff's representation of Dorel materially breached Dorel's assistance and cooperation obligations under the Policy. *See* Facts ¶ 13. This confirms that Ironshore is suing Schiff in tort for *the same alleged acts and omissions* it contends were *material breaches* of the *same contract* under which it indemnified Dorel.

Allowing a client's insurer to bring a negligent misrepresentation claim against the client's attorney without a contract between the two is inconsistent with the policy behind the economic loss rule: promoting clarity and encouraging parties to use contracts to allocate economic risks. *See Eby*, 435 S.W.3d at 247-48; *Sterling*, 259 S.W.3d at 799-800. Just as "imposing the risk of economic loss [for negligent misrepresentation] on [an] architect requires the architect to pass the cost along to the owner . . . . [who] will then pass the cost along to the various contractors and subcontractors," allowing attorneys to be held liable to their clients' insurers in tort would result in higher costs for insured clients. *See Eby*, 435 S.W.3d at 248. That inefficiency can – and should – be avoided by limiting insurers' remedies to the terms of their contracts and barring insurers from bringing negligent misrepresentation claims against their clients' attorneys unless the attorney expressly contracts to accept such liability. Accordingly, Ironshore's admission that its

---

[39] *See id.* at 246 (explaining that the "web of contracts [in a construction project] would be disrupted by tort suits between subcontractors or suits brought against them by a project's owner").

losses were caused by performing under the Policy bars its claim against Ironshore under the economic loss rule.

## III.    IRONSHORE HAS NO EVIDENCE ON THE FALSE INFORMATION ELEMENT, WHICH ENTITLES SCHIFF TO JUDGMENT AS A MATTER OF LAW.

The "false information" element of a negligent misrepresentation claim requires a false statement of ***existing fact***. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996) ("A claim for negligent misrepresentation under Texas law contemplates that the 'false information' provided by the defendant is a misstatement of *existing* fact.") (emphasis in original).   Statements of belief, opinion, or predictions, guesses, and estimates about future events are legally insufficient.  *See Direct Processing Sols., LLC v. Paychex, Inc.*, No. 3:12-CV-01073, 2012 WL 12888563, at *5 (N.D. Tex. July 31, 2012) ("[S]tatements of pure opinion . . . are not actionable negligent misrepresentations."); *Clardy*, 88 F.3d at 357 ("Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event.").  Even misleading statements are not enough – the statement must be ***false*** in order to be a negligent misrepresentation.  *See Direct Processing*, 2012 WL 12888563, at *5 ("[T]he misstatement of existing fact must be false and not merely misleading.").   "[RESTATEMENT] Section 552 thus requires a species of intent that is ***closer to that for fraud*** than to that for negligence."  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 607 (S.D. Tex. 2002) (emphasis added).

Additionally, negligent misrepresentation requires an affirmative misrepresentation.  *See Zipp Indus., Inc. v. Ranger Ins. Co.*, 39 S.W.3d 658, 669 (Tex. App.—Amarillo 2001, no pet.) ("Without evidence of a representation, [plaintiff] cannot meet the first element of a negligent misrepresentation claim.").  Thus, there is no cause of action for "negligent misrepresentation" based on omissions.  *See Hopkins v. Green Dot Corporation*, No. 5:16-CV-365-DAE, 2016 WL

4468272, at *9 (W.D. Tex. Aug. 24, 2016) ("[T]here is no Texas case law supporting a misrepresentation claim based upon an omission . . . . [T]o the extent that [the plaintiff's] negligent misrepresentation claims are based upon . . . failure to disclose certain information, these failures are not active misrepresentations actionable under the tort of negligent misrepresentation.").[40]

All of Ironshore's complaints attack alleged statements of belief, opinion, or predictions of future events, or omissions.  And Ironshore lacks any evidence of nearly-fraudulent intent.  Thus, Ironshore cannot support the false information element of a negligent misrepresentation claim.

**A.    Opinions expressing subjective beliefs about case settlement and exposure values and predicting the uncertain outcome of a future jury trial are not statements of existing fact and cannot support a negligent misrepresentation claim.**

Ironshore alleges that Schiff negligently *valued* the *Hinson* Case and Dorel and Ironshore's potential exposure.  *See, e.g.,* Complaint ¶ 24 ("Schiff's reporting negligently and falsely misrepresented the facts of the Lawsuit, its settlement value, and the exposure it presented to Ironshore's Policy."); *id.* at ¶ 27 ("Schiff knew or should have known that a settlement demand in excess of $6 million was plainly *warranted* by the facts of the case.") (emphasis in original).  Specifically, Ironshore faults the following alleged statements by Schiff about value or how the *Hinson* Case was progressing:

- "that a settlement within Ironshore's policy limits was 'unwarranted'" (Complaint ¶ 20);

- "that the Lawsuit would not involve Ironshore's policy limits and . . . Ironshore [should] set no reserves" (Complaint ¶ 28);

---

[40] RESTATEMENT OF TORTS § 552 does not support a negligent misrepresentation cause of action based on omissions either.  *See McLachlan v. New York Life Ins. Co.*, 488 F.3d 624, 630 (5th Cir. 2007) (stating that Section 552 "by its own terms requires an affirmative misstatement, not just a non-disclosure").  Although § 551 of the RESTATEMENT provides "liability for nondisclosure," the Texas Supreme Court has "never adopted section 551" and certainly has not adopted it for a negligent misrepresentation cause of action.  *See Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001).

- "Plaintiffs' $7.0 million settlement demand was not a 'realistic assessment of the facts of [the *Hinson*] case'" (Complaint ¶ 30(a));

- "'[that the *Hinson*] Plaintiffs have already reached their ceiling of recovery' by an earlier settlement" (Complaint ¶ 30(d)); and

- "'Day 1 [of trial of the *Hinson* case] went pretty well;' 'On balance, today [day 2] was fine;' and, 'We put on our whole case on Day 3.  It went well.'" (Complaint ¶ 45).

An opinion on the value of litigation is not a statement of existing fact and cannot support a negligent misrepresentation claim as a matter of law.  In *Faircloth*, upon reaching majority, a daughter whose guardian previously recovered on her behalf by settling the wrongful death of her alleged parents for $250,000, brought suit for fraudulent misrepresentation against the insurance company with whom her guardian settled.  *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 271-73 (Tex. 1995).  The daughter complained that the insurance company explained to her that the $250,000 settlement was a "great deal" and "top dollar" when expert attorneys had told the insurer the case was worth up to $500,000.  *See id.* at 276-77.[41]

In rejecting the daughter's fraud claim, the Texas Supreme Court held that "[a]n expression of opinion about monetary value is not a representation of fact."  *See id.* at 276.  The Court held that opinions as to the value of a litigation claim are not statements of existing fact because:

> The value of such an unliquidated claim is inherently a matter of opinion.  Whether the amount of a settlement offer approximates what a jury would award at trial depends on unpredictable factors such as favorable rulings from the trial court on venue and other legal issues, the jury, the availability and credibility of witnesses, the ability of the attorneys, and so forth.

*Id.* at 277; *see also Ryan v. Collins*, 496 S.W.2d 205, 210 (Tex. App.—Tyler 1973, writ ref'd n.r.e.) ("[A] mere expression of an opinion as to the value that proves to be incorrect or false generally is not considered to be a misrepresentation of a material fact upon which one may rely.").

---

[41] "One expert from Beaumont estimated that the case was worth 'up to' $500,000 or more, while another expert from Houston estimated its value at $350,000 to $400,000."  *See id.* at 277.

The Mississippi Supreme Court has addressed allegations similar to Ironshore's and reached the same conclusion. *See Great American E & S Ins. Co. v. Quintaros, Prieto, Wood & Boyer, P.A.*, 100 So.3d 420 (Miss. 2012). In *Great American*, the defense lawyer hired by an insured's primary carrier sent the excess carrier "status reports, including an evaluation and opinion that the case's settlement value was between $150,000 and $400,000." *See* 100 So.3d at 422. Like Ironshore, the excess carrier alleged that the defense lawyer negligently misrepresented the case's value in the status reports. *See id.* at 426. In affirming dismissal of the negligent misrepresentation claim, the court expressly held that "[p]roviding bad opinions is not misrepresentation." *See id.*

Schiff's subjective beliefs about the *Hinson* Case simply are not actionable, because they are not statements of existing fact. *See Lake v. Cravens*, 488 S.W.3d 867, 891 (Tex. App.—Fort Worth 2016, no pet.) ("Since a statement concerning a matter not susceptible of exact knowledge by the speaker is no more than the expression of a belief, one making such a statement *in good faith* is not liable for its falsity.") (quoting *Harris v. Sanderson*, 178 S.W.2d 315, 319 (Tex. App.—Eastland 1944, writ ref'd w.o.m.)); *Direct Processing*, 2012 WL 12888563, at *5.

Similarly, to the extent Schiff expressed beliefs on the potential impact of evidence in the *Hinson* Case, these views merely are predictions, estimates, or guesses that cannot support a negligent misrepresentation claim. *See Clardy*, 88 F.3d at 357 (negligent misrepresentation claim failed as a matter of law because it was "at most . . . a misstatement as to a *future* action"). For example, Ironshore faults Schiff for allegedly conveying the following statements:

- "an industry study showing front-facing child seats unsafe for children under age 2 was 'irrelevant;'" (Complaint ¶ 30(b)); and

- "Dorel rejects the idea that the minor Plaintiff 'has any sort of brain injury and refuses to place any value on it;'" (Complaint ¶ 30(c)).

But these are statements about how the jury may view the evidence at a future trial in the *Hinson Case* or how Dorel viewed the plaintiffs' claims.  Such subjective beliefs and predictions about future events are not statements of *existing fact*.  Indeed, Texas courts routinely reject negligent misrepresentation claims that are based on predictions, guesses, or opinions about future events.[42] The same should occur here.

> **B.**     **Ironshore has no evidence that Schiff's statements were false or even negligent or that Schiff's preparation and trial of the *Hinson* Case did not meet an attorney's standard of care.**

Even if Schiff's statements theoretically could support a negligent misrepresentation claim (and they cannot, as a matter of law), Ironshore has no expert testimony or other evidence that Schiff's evaluations were negligent, let alone "false information" as Texas law requires. Ironshore's purported standard-of-care expert, Enoch, has no opinion that Schiff negligently evaluated or litigated the *Hinson* Case.[43]   And the evidence suggests that the Hinson plaintiffs' counsel also valued the case at or below the Policy's $7 million attachment point.[44]   Schiff's statements can hardly be false – or even negligent – when the *Hinson* plaintiffs' counsel valued

---

[42] *See, e.g.*, *Moncrief Oil Intern. Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007) (affirming dismissal of plaintiff's negligent misrepresentation claim because the allegations "concerned the *future* behavior of [the defendant] – that [it] would *continue* to honor the agreements – rather than an existing fact.") (emphasis in original); *Direct Processing*, 2012 WL 12888563, at *5-6 ("Promising to conduct business in a certain way in the future cannot be a misstatement of a present fact.") (citing *Clardy*, 88 F.3d at 357); *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 978-79 (N.D. Tex. 2014) (dismissing negligent misrepresentation claims where the allegations concerned "the anticipated success and safe management of [the plaintiff's] investment" because these "were promises of future conduct rather than statements of existing fact") (quoting *Miller v. Raytheon Aircraft Co.*, 299 S.W.3d 358, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

[43] *See* Ex. A-1 (Enoch Dep.) at 59:2-21 (admitting, among other things, that Enoch is "not here expressing an opinion on whether [Schiff was] negligent in their representation of Dorel."); *id.* at 60:15-61:9 ("Q: And you're not expressing any opinion that Schiff negligently evaluated or estimated the value of the Hinson case? A: . . . My concern about Schiff Hardin's – it's not their evaluation of the case. . . . It's not whether they were negligent in evaluating the case or representing Dorel in the case.") (objection omitted).

[44] *See* Ex. A-14 (April 6, 2016 Demand Letter) ("[E]ven taking all those factors into account, I am authorized to make a demand of $7,000,000 to resolve any and all claims Plaintiffs may have against Dorel.").

the case below the Policy's attachment point.  *See Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989) ("If an attorney makes a decision which a reasonably prudent attorney *could* make in the same or similar circumstance, it is not an act of negligence even if the result is undesirable.") (emphasis in original).

Similarly, although Ironshore alleges that Schiff "falsely represented [to Ironshore] that the early trial date [of the *Hinson* Case] did not prejudice [Schiff's] preparations," *see* Complaint ¶ 34, Ironshore has no evidence of falsity and no expert opinion supporting any actual prejudice at trial.  On April 15, 2016, Schiff filed a motion to strike the supplemental report of one of the Hinson plaintiffs' expert witnesses for belatedly disclosing an opinion on the child's alleged brain injury.[45]  In the motion, Schiff and Dorel's local counsel, Anthony Avey, argued that "the potential prejudice of the [expert's] testimony [was] enormous," and that if the untimely testimony were permitted, "trial would need to be postponed for months."[46]  On April 29, with the motion still pending, the Court accelerated the trial of the *Hinson* Case from July 11 to June 13.[47]  Then, on May 20, Schiff told Ironshore that "[w]hile the acceleration of the trial date is somewhat unwelcome, it doesn't prejudice our preparations at all."[48]

Ironshore suggests that this statement – made over a month after Schiff filed the April 15 motion – was somehow "the opposite" of what Schiff represented to the Court.  *See* Complaint ¶ 35.  It was not.  Schiff and Avey sincerely urged their good-faith positions to the Court, but vigorously prepared for trial on the assumption that the testimony they sought to exclude might be

---

[45] *See Hinson* Case Dkt. 44; *see also* Complaint ¶ 35.

[46] *See Hinson* Case Dkt. 44 at pp. 6-7; *see also* Complaint ¶ 35.

[47] *See Hinson* Case Dkt. 50 (noting jury selection to begin July 11, 2016); *Hinson* Case Dkt. 52 (accelerating the trial date to June 13, 2016 with jury selection to begin on May 31, 2016).

[48] *See* Ex.  A-15 (Jonathan Judge Email to Michelle Anderson).

admitted.  Ironshore has no evidence that on May 20, 2016 – over a month after the motion was filed, and having spent that entire time not knowing whether it would be granted – Schiff and Avey did not believe that any potential prejudice had been averted, or that Schiff was impeded in preparing for trial.  More fundamentally, Ironshore has no expert testimony and no evidence that Dorel actually was prejudiced.  In fact, the available evidence shows that Schiff prepared for trial as if the brain injury testimony would be permitted despite its April 15 motion.[49]  Schiff and Avey's argument to the Court on April 15 and Schiff's statement to Ironshore on May 20 are not inconsistent, and neither contains a false statement that can support a negligent misrepresentation claim by Ironshore.

### C.    Omissions are not actionable as negligent misrepresentations.

The balance of Ironshore's complaints involve Schiff's alleged failure to disclose various information to Ironshore before the *Hinson* trial that supposedly would have led Ironshore to reach a different conclusion about the case's value.  Specifically, Ironshore alleges that Schiff failed to disclose:

- "that Dorel actually faced an uphill battle in the [*Hinson* Case] because Dorel had strongly urged, for many years, the same position that Plaintiffs were advancing . . . front facing seats were dangerous for kids under the age of two" (Complaint ¶ 33);

- "a) Dr. Altman's report; b) that Dorel would suffer enormous prejudice unless the Court struck Dr. Altman's opinion; or, c) that trial would need postponement for months" (Complaint ¶ 36);

- "two (2) Orders filed June 9, 2016" (Complaint ¶ 39);

---

[49] *See, e.g.* Ex. A-16 (Judge Dep.) at 128:23-129:4 ("Q: And even though you advised the Court that Dorel would suffer enormous prejudice if the traumatic brain injury claim would come into the case, you never advised Ms. Anderson that that enormous prejudice would be suffered, did you?  A:  That's because our assessment changed . . . ."); *id.* at 315:22-316:6 ("Q: Is there any witness on Exhibit 9A that actually addressed the brain injury issue? . . .  A: . . . . Dr. Harrell, was the witness who we had planned to testify. And we did not believe his testimony was required, so we did not call him . . . ."; Ex. A-17 (Schiff Rule 30(b)(6) Dep.) at 127:9-128:3 ("A: . . .  In fact, we did have a Medical Doctor obviously testify at trial, and she did discuss the causation of the brain injury. . . .  Q: . . . . You're referring to Dr. Gwin?  A:  Yes.").

- "other adverse rulings that held that Dorel's post-accident conduct was also relevant and admissible" (Complaint ¶ 41); and

- that "[the *Hinson*] Plaintiffs actually offered to settle for $3.25 million" (Complaint ¶ 48).

Even if all these alleged "failures to disclose" were true (which Schiff denies), they would not raise a fact issue on the "false statement" element of negligent misrepresentation.  Although Texas law allows fraud claims based on omissions, the same is not true for negligent misrepresentation – the only claim that Ironshore pled.  *Kastner*, 231 S.W.3d at 578-79 ("In the context of fraud, a misrepresentation may consist of the concealment or nondisclosure of a material fact when there is a duty to disclose.  Negligent misrepresentation, however, contemplates a misstatement of existing fact."); *Hopkins*, 2016 WL 4468272, at *9 ("[T]here is no Texas case law supporting a misrepresentation claim based upon an omission . . . .").

Several cases addressing very different facts appear to conflate negligent misrepresentation with a fraudulent omission cause of action.  *See, e.g.*, *Brown & Brown v. Omni Materials*, 317 S.W.3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (applying law of the case doctrine to note in dicta that a misrepresentation need not be an affirmative statement if there is an express duty to disclose, and pointing to four situations in which a duty to disclose may arise); *Hardy v. Zimmer*, 2017 WL 1551601, at *2 (E.D. Tex. Apr. 28, 2017) (relying on *Brown* in stating that a negligent misrepresentation claim "may be based on a failure to disclose information when there is a duty to disclose such information").  But as *Kastner* and *Hopkins* make clear, omissions cannot give rise to a cause of action for negligent misrepresentation under Texas law, even though they sometimes can support the separate – and here, unpled – tort of fraudulent nondisclosure.  Thus, Schiff's alleged omissions cannot support a negligent misrepresentation claim.

IV.     **CONCLUSION**

Schiff respectfully requests that the Court grant summary judgment in its favor, dismiss all claims against it with prejudice and render summary judgment in its favor and order such other and further relief as the Court finds appropriate.  Schiff requests an oral hearing on this motion under Local Rule CV-7(g).

Respectfully submitted,


 */s/ George M. Kryder*
George M. Kryder
  State Bar No. 11742900
  gkryder@velaw.com
Matthew W. Moran
  State Bar No. 24002642
  mmoran@velaw.com
Jordan W. Leu
  State Bar No. 24070139
  jleu@velaw.com
Jeremy M. Reichman
  State Bar No. 24083722
  jreichman@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Telephone: (214) 220-7700
Fax: (214) 220-7716

*Attorneys for Defendant Schiff Hardin LLP*

## CERTIFICATE OF SERVICE

I certify that on January 4, 2018, a true and correct copy of the foregoing document was served on all counsel of record using the Court's electronic filing system.

 /s/ George M. Kryder
George M. Kryder