1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                   MARSHALL DIVISION

4   IRONSHORE EUROPE DAC,        §

                                 §

5       Plaintiff,               §

                                 §

6   V.                           §        NO. 2:17-cv-431

                                 §

7   SCHIFF HARDIN LLP,           §

                                 §

8       Defendant.               §

9

10

11          ORAL AND VIDEOTAPED DEPOSITION OF

12                 MICHELLE ANDERSON

13                 OCTOBER 12, 2017

14

15          ORAL AND VIDEOTAPED DEPOSITION of

16   MICHELLE ANDERSON, produced as a witness at the

17   instance of the Defendant, and duly sworn, was taken

18   in the above-styled and numbered cause on the 12th of

19   October, 2017, from 9:00 a.m. to 5:05 p.m., before

20   Jennifer Quick Davenport, CSR in and for the State of

21   Texas, reported by machine shorthand, at the offices

22   of Parsons McEntire McCleary & Clark PLLC,

23   1700 Pacific Avenue, Suite 4400, in the City of

24   Dallas, County of Dallas, State of Texas, pursuant to

25   Notice and the Federal Rules of Civil Procedure.

Exhibit A-6

**204**

1 can look at most pleadings and motions and orders in a
2 case?
3     A.  I -- I sit in London.  I have defense counsel
4 that I rely on --
5     Q.  You have --
6     A.  -- to give me this information.  I -- I
7 have --
8     Q.  You just don't know --
9         MR. McENTIRE:  Please let her finish the
10 answer, George.
11        MR. KRYDER:  Okay.
12    A.  I have 500-plus cases.  I don't look at every
13 minute detail --
14    Q.  (By Mr. Kryder)  Okay.
15    A.  -- which is why I expect the five important
16 areas to be given to me.
17    Q.  Okay.  And you -- you never -- one of the
18 five important areas was not asking Mr. Judge or
19 anyone at Schiff to provide you with pleadings,
20 motions or orders in the case, correct?
21    A.  Correct.
22    Q.  All right.  And so you say that you weren't
23 aware of what the court's ruling was on that
24 particular matter, but you hadn't asked him for those
25 particular rulings, correct?

**205**

1     A.  No.  I would tend not to check up on defense
2 counsel with everything.  I expect them to tell me.
3     Q.  Okay.  Tell me, then, anything else that you
4 say is a supposed oral or written misrepresentation by
5 Mr. Judge or anyone at the Schiff firm.
6     A.  I wasn't aware that punitive damages were a
7 big part of the case.  The last I heard was that
8 Jonathan was filing a motion for summary judgment to
9 have them dismissed, and then I think in one of the
10 summaries following that he referred to them in past
11 tense.  I was never told that a court order had been
12 passed.
13    Q.  And, again, just as with your previous answer
14 about the brain injury case, you did not inquire of
15 Mr. Judge or anyone at Schiff about whether there had
16 been a ruling on the Motion for Summary Judgment
17 concerning punitive damages?
18    A.  No.  As -- as my last answer stated, I would
19 have expected to be told something that significant
20 from counsel.
21    Q.  All right.  Is there any other purported oral
22 or written misrepresentation by Schiff that Ironshore
23 is complaining about?
24    A.  I -- I believe that I asked Jonathan Judge if
25 the trial date would prejudice our position at all,

**206**

1 and he confirmed that it wouldn't prejudice their
2 preparations in any way or at all or -- I'm -- I'm not
3 sure what his words were --
4     Q.  So you wrote a --
5         MR. McENTIRE:  Please let her finish.
6 She was not finished.
7     A.  -- when, in fact, before he told me that the
8 trial date wouldn't prejudice their preparations at
9 all.  I think now I understand an order had been
10 passed or a motion had been filed where Jonathan had
11 actually said that the trial date, if the brain injury
12 came in, would severely prejudice his trial
13 preparation, and he would need at least another six
14 months or...
15    Q.  (By Mr. Kryder)  You never saw that document
16 at the time, correct?
17    A.  Correct.
18    Q.  And this is something that someone has told
19 you after this lawsuit was filed, correct?
20    A.  Yes.  All this information is -- well, not
21 after the lawsuit was filed.  All this information has
22 come out after the verdict.
23    Q.  After the verdict?
24    A.  Yes.
25    Q.  Okay.  And this is information that

**207**

1 Mr. Parsons provided to you and Mr. McEntire provided
2 to you --
3         MR. McENTIRE:  Don't answer that
4 question.
5     Q.  (By Mr. Kryder)  -- correct?
6         THE WITNESS:  I wasn't going to.
7         MR. McENTIRE:  That question's asked in
8 bad faith.
9         MR. KRYDER:  No, it's not bad faith.
10        MR. PARSONS:  Of course it is.
11        MR. McENTIRE:  You can't ask -- you can't
12 ask a question about conferences with counsel.
13        MR. KRYDER:  I'm not asking for the
14 substance.  I'm trying to find out if this is
15 something that is a prelude to this lawsuit.
16    A.  All this information came out after the
17 verdict.
18    Q.  (By Mr. Kryder)  All right.  Now, you said
19 that you asked Mr. Judge if this punitive damages
20 issue might prejudice -- I'm sorry, the issue about
21 the trial date might prejudice the case?
22    A.  Yes.
23    Q.  So we can expect to find an email to
24 Mr. Judge in which you ask whether the potential
25 change in the trial date would prejudice the case,

Michelle Anderson - October 12, 2017

**224**

1    Q. All right. So you recall receiving the news
2  that Dorel were going to ask the judge to delay the
3  punitive damage proceedings so that they could
4  interact with Ironshore?
5    A. Yes.
6    Q. Okay. And then you understood that the court
7  refused to delay the punitive damages aspect and it
8  was going to go forward?
9    A. Yes.
10    (Exhibit No. 33 marked.)
11    Q. (By Mr. Kryder) I'm going to show you next,
12  Ms. Anderson, what has been marked for identification
13  as Exhibit 33 and ask if you recall this string of
14  communications about the adverse jury verdict?
15    A. Yes.
16    Q. So it appears, from the second page of
17  Exhibit 33, that Mark Hill first heard about the
18  adverse verdict from Mary Faith Green?
19    A. Yes.
20    Q. Okay. And why is it that Mr. Hill is hearing
21  about this adverse verdict from an outside broker
22  instead of hearing from you?
23    A. Because I -- I think this was only 10 minutes
24  after I'd heard, and it was 9 o'clock in the evening
25  my time, so I may not have checked my phone

**225**

1  straightaway.
2    Q. Okay. So Mr. Hill receives the news of the
3  adverse verdict --
4    A. Yes.
5    Q. -- and says WTF, right?
6    A. Yes.
7    Q. You respond to Mr. Hill on the first page of
8  Exhibit 33, they could have settled this below the
9  self-insured retention.
10    Do you see that?
11    A. Yes.
12    Q. What information did you have on June the
13  17th, 2016, that Dorel wanted to settle the case below
14  the self-insured retention?
15    A. None. This is referring back to the previous
16  offer made at the mediation.
17    Q. Which was 6.75 million?
18    A. Yes. I think that's correct.
19    Q. Okay. And it certainly was Dorel's right not
20  to settle a case within its retention, wasn't it?
21    MR. McENTIRE: Objection; form.
22    A. We couldn't have made Dorel settle, but we
23  could have settled.
24    Q. (By Mr. Kryder) Okay. So when you say you
25  could not have made Dorel settle, that's because the

**226**

1  insurance policy did not permit Ironshore to force
2  Dorel to agree to any particular settlement amount,
3  correct?
4    A. That's true. There's no hammer clause in the
5  policy, but there's no consent clause either --
6    Q. Okay.
7    A. -- so we could have settled.
8    Q. All right. And you're saying that even over
9  Dorel's objection, that Ironshore could have reached a
10  settlement directly with the plaintiff in the case?
11    A. If we had known the true -- true value of the
12  matter, it could have been a decision Ironshore took,
13  yes.
14    Q. But you can't say that Ironshore actually
15  would have made the decision to attempt to settle the
16  case, correct?
17    A. That would have been above my authority.
18    Q. Okay. And you can't say whether Ironshore,
19  in fact, would have been able to achieve a settlement
20  for any particular amount with the Hinsons, correct?
21    A. Well, after the verdict, I was informed by
22  Jonathan Judge that there was a 3.25 million offer
23  made, so it would appear the plaintiffs wanted to
24  settle.
25    MR. KRYDER: Okay. Well, objection;

**227**

1  nonresponsive.
2    Q. (By Mr. Kryder) You don't have any personal
3  information that the plaintiffs would have settled for
4  any amount below $6.75 million, do you?
5    MR. McENTIRE: Objection; form.
6    A. Well, I --
7    MR. McENTIRE: Asked and answered.
8    A. I was on the call when Jonathan told us about
9  the 3 million.
10    Q. (By Mr. Kryder) And we've already talked
11  about that.
12    I'm talking about from -- you understand
13  that -- do you have any information from the
14  plaintiffs themselves that they would have accepted a
15  dollar amount in settlement below 6.75 million?
16    A. I never liaised directly with the plaintiffs.
17    Q. Do you have any information from the
18  plaintiffs that they would have agreed to settle the
19  case without getting a release from Dorel?
20    A. I have never liaised directly with the
21  plaintiffs.
22    Q. Okay. So when you say we could have settled
23  the case without Dorel, that's really speculation on
24  your part, not based on personal knowledge, correct?
25    MR. McENTIRE: Objection; form.

1           I, MICHELLE ANDERSON, have read the

2  foregoing deposition and hereby affix my signature

3  that same is true and correct, except as noted above.

4

5                          _____

                           MICHELLE ANDERSON

6

7

8

9

10  THE STATE OF LONDON )

11  COUNTY OF ENGLAND )

12  Country     Before me, CRISTINA LEONE , on this

13  day personally appeared MICHELLE ANDERSON, known to me

14  (or proved to me under oath or through

15  UK DRIVING LICENCE(description of identity card or

16  other document) to be the person whose name is

17  subscribed to the foregoing instrument and

18  acknowledged to me that ~~they~~ she executed the same for the

19  purposes and consideration therein expressed.

20          Given under my hand and seal of office this

21  21st day of December , 2017.

22

23                       Notary Public London, England (Cristina Leone)

                     _____

                    NOTARY PUBLIC IN AND FOR

24                   THE STATE OF ENGLAND and Wales

  My commission expires: MY COMMISSION EXPIRES AT DEATH

25    Leone & Co Notaries
    54 Fenchurch Street
    London EC3M 3JY
    Tel. +44 (0)20 3637 2657

**82 (Pages 304 to 306)**

**Michelle Anderson - October 12, 2017**

---

**304**

1              CHANGES AND SIGNATURE
2    **WITNESS NAME:**  MICHELLE ANDERSON  OCTOBER 12, 2017
3    PAGE  LINE  CHANGE            REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

---

**306**

1    STATE  OF  TEXAS )
2    COUNTY OF DALLAS )
3              I, Jennifer Quick Davenport, Certified
4    Shorthand Reporter, in and for the State of Texas,
5    certify that the foregoing deposition of
6    MICHELLE ANDERSON was reported stenographically by me
7    at the time and place indicated, said witness having
8    been placed under oath by me; that review was
9    requested pursuant to Federal Rule of Civil Procedure
10   30(e)(1); and that the deposition is a true record of
11   the testimony given by the witness.
12             I further certify that I am neither counsel
13   for nor related to any party in this cause and am not
14   financially interested in its outcome.
15            Given under my hand on this the 18th day of
16   October, 2017.
17            _____
                  Jennifer Quick Davenport, Certified
18                Shorthand Reporter No. 1683
                  Dickman Davenport, Inc.
19                Firm Registration #312
                  Suite 101
20                4228 North Central Expressway
                  Dallas, Texas 75206
21                214.855.5100   800.445.9548
                  email:  jqd@dickmandavenport.com
22                My commission expires 12-31-18
23   Time used by each party:
       Mr. Sawnie A. McEntire - 0:00
24   Mr. George M. Kryder - 6:05
25

---

**305**

1          I, MICHELLE ANDERSON, have read the
2    foregoing deposition and hereby affix my signature
3    that same is true and correct, except as noted above.
4
5              _____
                  MICHELLE ANDERSON
6
7
8
9
10   THE STATE OF _____)
11   COUNTY OF _____)
12        Before me, _____, on this
13   day personally appeared MICHELLE ANDERSON, known to me
14   (or proved to me under oath or through
15   _____) (description of identity card or
16   other document) to be the person whose name is
17   subscribed to the foregoing instrument and
18   acknowledged to me that they executed the same for the
19   purposes and consideration therein expressed.
20        Given under my hand and seal of office this
21   _____ day of _____, 2017.
22
23              _____
                  NOTARY PUBLIC IN AND FOR
24                THE STATE OF _____
       My commission expires: _____
25

---

**Dickman Davenport, Inc**
**214.855.5100      www.dickmandavenport.com      800.445.9548**