# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| IRONSHORE EUROPE DAC, | § | |
| *Plaintiff*, | § | |
| v. | § | CIVIL ACTION NO. 2:17-CV-00431-JRG |
| SCHIFF HARDIN, LLP, | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Schiff Hardin, LLP's ("Schiff") Motion to Dismiss Plaintiff Ironshore Europe DAC's ("Ironshore") First Amended Complaint (Dkt. No. 17) ("the Motion"). Having considered the same, and for the reasons set forth herein, the Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

### I. Background

In November 2014, Ironshore issued an insurance policy to Dorel Juvenile Group, Inc. ("Dorel"). (Dkt. No. 10 ¶ 2.) On May 13, 2015, Dorel was sued by Nicole and Cameron Hinson on behalf of their minor child who was injured in a car accident involving a product manufactured by Dorel. *See Hinson v. Dorel Juvenile Group, Inc.*, No. 2:15-cv-713-JRG-RSP, Dkt. No. 1 (E.D. Tex. May 13, 2015). In this underlying case, Dorel was represented by Schiff, the defendant in the instant case. (Dkt. No. 10 ¶ 2.)

While representing Dorel, Schiff regularly communicated with Ironshore. *Id.* at ¶ 3. Specifically, Ironshore was concerned that if the *Hinson* case resulted in an award or settlement in excess of $6 million, then Ironshore might have to pay out on its insurance policy with Dorel. *Id.* at ¶ 19. Against this backdrop, Ironshore alleges that on several occasions Schiff misled Ironshore

into believing it was unlikely the *Hinson* case would result in any exposure for Ironshore. *See, e.g., id.* at ¶ 20 ("At various times during the Lawsuit, Schiff misrepresented to Ironshore that a settlement within Ironshore's policy limits was 'unwarranted.'"). Ironshore also alleges that Schiff withheld other critical information about developments in the lawsuit. For example, Ironshore alleges that "Schiff falsely represented that the last offer of settlement received from Plaintiffs was $6.5 million" when in reality the *Hinson* Plaintiffs had expressed a willingness to settle for as little as $3.25 million. *Id.* at ¶ 48. Ironshore further alleges that "Schiff's various misrepresentations led Ironshore to believe that the Ironshore Policy was not at risk. Thus, Ironshore did not associate in the defense of the lawsuit." *Id.* at ¶ 20. Had Ironshore been given an accurate picture of the *Hinson* case, Ironshore alleges it "would have exercised its right to settle the case . . . [or] paid the Plaintiffs to release all claims." *Id.* at ¶ 49. Instead, the case went to trial and the jury awarded the *Hinson* Plaintiffs $34 million. *Id.* at ¶ 46. This verdict, being in excess of $6 million, would have required Ironshore to pay out on its policy with Dorel. *Id.* at ¶¶ 46–47. After eventually settling with the *Hinson* Plaintiffs after trial, Ironshore filed this case against Schiff. *Id.* Defendant has now moved to dismiss Ironshore's negligent misrepresentation claim, which is the only claim in this case.

## II. **Legal Standard**

### A. **Applicable Law**

When a federal court hears state law claims based on diversity jurisdiction, it generally applies the substantive law of the state in which it sits. *See, e.g., Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 593–94 (5th Cir. 2011); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). For example, if there is precedent from that state's highest court, or other binding authority interpreting such precedent, that authority controls with respect to questions of state law. *Gilbane*, 664 F.3d at

593–594; *Motiva Enterprises, LLC v. St. Paul Fire & Marine Ins. Co.*, 445 F.3d 381, 385 (5th Cir. 2006) ("Under *Erie*, we are, of course, obliged to decide questions of state law as we believe the state supreme court would decide the issue."). To the extent there is uncertainty about a question of state law, federal courts must make an "*Erie* guess" as to how the state's highest court would decide the question. *Gilbane*, 664 F.3d at 593–594. Generally, this "*Erie* guess" is based on "cases that, while not deciding the issue, provide guidance as to how the [state high court] would decide the question." *Id.* (internal quotations omitted). These cases can include decisions from lower state courts or others who have ventured a similar *Erie* guess. *Id.*

In spite of these general choice-of-law rules, Parties to a contract may also specify that a particular state's laws should govern the interpretation of their agreement through what is often called a forum-selection clause. In these circumstances, interpretation of the agreement is guided by the substantive law of the chosen forum state. *See, e.g., Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301–302 (5th Cir. 2016) (explaining that federal law controls question of the enforceability of forum-selection clauses, while interpretation of such clauses is governed by the law of the chosen forum).

Finally, regardless of whether state law controls questions of substantive law or contract interpretation, "federal courts sitting in diversity apply . . . federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Taylor v. Bailey Tool Mfg. Co.*, 744 F.3d 944, 947 (5th Cir. 2014) (federal procedural rules apply once a case has been removed).

### B. <u>Motions to Dismiss for Failure to State a Claim</u>

A motion to dismiss under Federal Rule of Procedure 12(b)(6) should be granted when a complaint fails to state a plausible claim for relief even where all well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff. *Bustos v. Martini Club, Inc.*, 599

F.3d 458, 461 (5th Cir. 2010); *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 633 (5th Cir. 2014) (applying 12(b)(6) framework to case removed from state court).[1] In considering such a motion, a court may rely on "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). "[M]atters or theories raised in a response are not part of the pleadings" and thus do not supplement the allegations in the complaint. *Lohr v. Gilman*, No. 3:15-CV-1931-L, 2017 WL 1178259, at *11 (N.D. Tex. Mar. 30, 2017).

C. **Attorney Immunity**

Texas law recognizes that "as a general rule, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (internal quotation marks omitted). This immunity allows attorneys "to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Id.* (quoting *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. Civ. App.–Dallas 1910, writ ref'd)); *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287 (Tex. App.–Forth Worth 1997, writ denied) ("An attorney may assert any of his client's rights without being personally liable for damages to the opposing party."). Without such an immunity,

---

[1] In some cases, courts have applied a heightened pleading standard to negligent misrepresentation claims when they sound in fraud. *See, e.g., Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010) ("This court has applied the heightened pleading requirements [to negligent misrepresentation claims] when the parties have not urged a separate focus on the negligent misrepresentation claims such as when fraud and negligent misrepresentation claims are based on the same set of alleged facts." (internal brackets and quotations omitted)). However, Defendant did not argue that Plaintiff's negligent misrepresentation claim was equivalent to a claim of fraud or deserving of Rule 9(b) scrutiny. (Dkt. No. 17 at 2 ("Under FED. R. CIV. P. 12(b)(6), Defendant Schiff Hardin LLP ("Schiff") respectfully moves to dismiss Ironshore Europe DAC's ("Ironshore") First Amended Complaint, which fails to state a claim for negligent misrepresentation . . . .").) Thus, in this case, the Court will not apply a heightened pleading standard. *See Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668 n.30 (5th Cir. 2004) (unpublished) (collecting cases discussing waiver in this context).

an attorney would face an "inevitable conflict" in "balanc[ing] his own potential exposure against his client's best interest." *Id.*

### D. <u>Negligent Misrepresentation</u>

Texas law has also long recognized that an attorney may be liable for negligent misrepresentation under Section 552 of the Restatement of Torts[2] where a third party, even a non-client, justifiably relies on the attorney's misrepresentations. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792–794 (Tex. 1999). The duty imposed in this context is "limited," and it arises "only when (1) the attorney is aware of the non-client and intends that the non-client rely on the representation; and (2) the non-client justifiably relies on the attorney's representation of a material fact." *Blankinship v. Brown*, 399 S.W.3d 303, 309–310 (Tex. App.–Dallas 2013) (citing *McCamish*, 991 S.W.2d at 794). Liability under *McCamish* is further limited by the same principles that constrain the tort of negligent misrepresentation. For example, negligent misrepresentation applies to misstatements of existing facts rather than predictions that simply turn out to be wrong. *See, e.g., Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007) ("[T]he complaint alleged a misstatement of a future event, rather than misstatement of an already existing fact. It therefore fails as a negligent misrepresentation claim . . . .").

---

[2] Section 552 of the Restatement provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977).

5

### III. Discussion

#### A. Attorney Immunity

Defendant argues that because the misrepresentations identified by Plaintiff in its Amended Complaint were made while Schiff was representing its client Dorel in the *Hinson* case, Plaintiff's claim is barred by the doctrine of attorney immunity. (Dkt. No. 17 at 20–25.) In particular, Defendant argues that because it provided information to Ironshore pursuant to Dorel's obligations under its insurance contract with Ironshore, whatever representations Defendant made to Ironshore fall within the scope of attorney immunity. *Id.*

Plaintiff responds that attorney immunity does not apply in this case because Schiff "expressly assumed an independent duty to guide Ironshore," which, under *McCamish*, can provide the basis for a negligent misrepresentation claim where, as here, Plaintiff justifiably relies on misstatements by a defendant. (Dkt. No. 28 at 5, 20–21.) Plaintiff further argues that Schiff's statements were made out of court and "in discharge of an independent duty Schiff knowingly assumed to Ironshore, a non-client" and thus the statements fall outside the core of what attorney immunity doctrine is intended to protect. *Id.* at 21.

Defendant maintains that attorney immunity is a shield to liability in this case, suggesting that to the extent *McCamish* holds otherwise it cannot be regarded as good law in light of *Cantey Hanger*. (Dkt. No. 17 at 25–26.)

At the outset, given the disagreement between the Parties as to the application of Texas law as to the contours of attorney immunity, this Court must venture a so-called "*Erie* guess." *Gilbane*, 664 F.3d at 593–94. Such an inquiry must begin with an acknowledgment that the Texas Supreme Court has recognized a cause of action for negligent misrepresentation by a lawyer in an action brought by a third party, non-client such as Ironshore. *See McCamish*, 991 S.W.2d at 793

("A typical negligent misrepresentation case involves one party to a transaction receiving and relying on an evaluation, such as an opinion letter, prepared by another party's attorney."). However, Defendant is correct that *McCamish* is somewhat in tension with more recent guidance from the Texas Supreme Court in *Cantey Hanger*. In *Cantey Hanger*, the Texas Supreme Court abrogated the fraud exception to attorney immunity by focusing on whether the conduct at issue, fraudulent or otherwise, fell outside the scope of the attorney's legal representation of his or her client. 467 S.W.3d at 483–484 ("Fraud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation."). Yet in *McCamish*, the alleged misstatement was made by the defendant, a lawyer, as part of a settlement negotiation to assure the opposing party that the underlying agreement was enforceable. 991 S.W.2d at 789–790. This assurance was clearly provided in the scope of the defendant lawyer's representation of his client. *Id.* at 789 ("Appling agreed to sign the agreement only if VSA's lawyers would affirm that the agreement did, in fact, comply with the statute. The parties and their attorneys signed a settlement agreement, dated March 8 and 9, 1989, in which the requested representations were made.").

Nevertheless, Defendant argues that applying *McCamish* in light of *Cantey Hanger* leads to an incongruous result, allowing claims for negligent misrepresentation to pierce the shield of attorney immunity while fraud claims cannot. However, the result is not quite so paradoxical. What motivated the result in *Cantey Hanger* was the principle that attorney immunity depends on the "kind-not the nature-of the attorney's conduct." *Cantey Hanger*, 467 S.W.3d at 483 ("Merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it foreign to the duties of an attorney." (internal quotation marks

7

omitted)). However, liability under Section 552 properly focuses on a limited *kind* of conduct. In effect, it is the existence of a duty to a third party, not merely the labeling of a statement as a misrepresentation, which forms the foundation of a claim under Section 552. *McCamish*, 991 S.W.2d at 792 ("Under the tort of negligent misrepresentation, liability is . . . based on . . . an independent duty to the nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely."). Moreover, the limitations placed on the imposition of this duty guard against the same concerns that give rise to attorney immunity. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 608 (S.D. Tex. 2002) ("Nor does § 552 expose an attorney 'to almost unlimited liability' because of its limitation on potential claimants to known parties to whom the attorney provided information for a known purpose and who justifiably relied upon that information."); *McCamish*, 991 S.W.2d at 794 ("Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context."). *Cantey Hanger* also dealt with an attorney who was engaging in direct advocacy on behalf of a client in vindicating that client's rights while *McCamish* dealt with conduct, like the representations in this case, that are not so clearly insulated by attorney immunity. *See Cantey Hanger*, 467 S.W.3d at 481 ("[A]ttorneys are immune from civil liability to non-clients for actions taken in connection with representing a client *in litigation*." (internal quotation marks removed, emphasis added)); *Cantey Hanger*, 467 S.W.3d at 488 (Green, J, Hecht, J, Johnson, J, Willett, J, dissenting) ("The policy reasons behind litigation immunity compel the conclusion that, to be entitled to litigation immunity, the defendant–attorney's conduct must have occurred in litigation."); *Green v. JPMorgan Chase Bank, N.A.*, No. 3:11-cv-1498-N, 2012 WL 12823700, at *9 (N.D. Tex. Aug. 30, 2012) ("Texas cases make clear that qualified immunity protects attorneys

from their conduct during *litigation* and claims investigation prior to filing suit, such as filing motions on behalf of their clients or making legal arguments." (emphasis in original)).

Regardless, under *Erie*, this Court is neither inclined nor empowered to overrule precedent from the Texas Supreme Court. *See Alvarez v. Liberty Mut. Fire Ins. Co.*, No. CIV.A. H-10-1292, 2012 WL 1123590, at *6 (S.D. Tex. Mar. 16, 2012) ("Liberty asks the Court to hazard an educated *Erie*-type guess that the Texas Supreme Court will abandon *Aranda*. In the absence of an explicit ruling by the Texas Supreme Court on the continuing vitality, this Court declines to overrule established state law precedent." (internal quotation marks and citations omitted)); *Gallier v. Woodbury Fin. Servs., Inc.*, No. CV H-14-888, 2016 WL 4765059, at *11 (S.D. Tex. Sept. 13, 2016) ("The intermediate-court opinions stating an unqualified-notice rule upon receipt of an insurance policy do not cite Texas Supreme Court authority overruling *Taylor*. Since a state's supreme court rulings are the primary guide for a federal court making a state-law *Erie* guess, *Taylor* is still good law." (internal citations omitted)). Moreover, the Texas Supreme Court in *Cantey Hanger* expressly declined to address, much less overrule, its decision in *McCamish*. *See Cantey Hanger*, 467 S.W.3d at 483 n.7 ("In *McCamish*, we held that an attorney can be liable to a non-client for negligent misrepresentation where 'an independent duty to the nonclient arises based on the attorney's manifest awareness of the nonclient's reliance on the misrepresentation and the attorney's intention that the nonclient so rely.' The plaintiffs do not assert such a claim here." (internal citations and brackets omitted)); *see also* (Dkt. No. 31 ("[T]he Texas Supreme Court [in *Cantey Hanger*] expressly **did not address** whether attorney immunity applies to negligent misrepresentation claims . . . ." (emphasis in original)). Finally, the Texas Supreme Court recently "reaffirm[ed]" the holding and importance of *McCamish* and its progeny. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 920 (Tex. 2010) ("We reaffirm today that

*McCamish* represents Texas law under section 552 of the Restatement."). Accordingly, the Court concludes that as it stands under current Texas law, the doctrine of attorney immunity does not foreclose a Section 552 negligent misrepresentation claim.[3]

### B. Negligent Misrepresentation

#### 1. Predictions about the future do not fall within the scope of a negligent misrepresentation claim

Defendant argues that statements about future outcomes or possibilities are not misstatements of existing facts and thus cannot, as a matter of law, support a claim for negligent misrepresentation. (Dkt. No. 17 at 8–11.) Plaintiff responds that its allegations do relate to statements of existing facts rather than predictions about the future. (Dkt. No. 28 at 13.)

The Court is not persuaded by Plaintiff's argument. Whether Ironshore would have to pay out in the underlying *Hinson* case depended on predictions about future outcomes, *i.e.* which party would prevail and the damages that might be awarded. Thus, Schiff's representations[4] that Ironshore would not have to pay out on its policy were premised on predictions about a future jury verdict or possible settlement rather than a misrepresentation of an existing fact.[5] *See, e.g., Clardy*

---

[3] Defendant attempts to distinguish *McCamish* by arguing that this case relates to "merely . . . alleged omissions and predictions" rather than affirmative statements, as in *McCamish*. (Dkt. No. 17 at 26.) However, such a distinction attacks the merits of Plaintiff's arguments. The question at this point is simply whether *any* Section 552 claim can survive a defense of attorney immunity. To the extent a Section 552 does not embrace omissions or predictions, Plaintiff's claim would fail regardless of attorney immunity.

[4] *See, e.g.,* (Dkt. No. 10 at ¶ 24 ("Schiff's reporting negligently and falsely misrepresented the facts of the Lawsuit, its settlement value, and the exposure it presented to Ironshore's Policy."); at ¶ 18 (alleging that failing to disclose certain information "misle[d] Ironshore to believe the Lawsuit posed no threat to Ironshore's policy limits."); ¶ 22 ("Schiff's various misrepresentations led Ironshore to believe that the Ironshore Policy was not at risk."); ¶¶ 27–28.)

[5] A limitation on attorney liability for predictions about potential jury verdicts or settlements in the context of Section 552 is particularly warranted because predicting these sorts of outcomes is notoriously difficult. *See, e.g., Ballard v. Citizens Cas. Co. of N. Y.*, 196 F.2d 96, 102 (7th Cir. 1952) ("[A]ttorneys are not endowed with the gift of prophecy so as to be able to predict what the verdict of a jury will be in a personal injury suit."); Reid Hastie, *Is Attorney–Conducted Voir Dire an Effective Procedure for the Selection of Impartial Juries?*, 40 Am. U.L.Rev. 703, 720 (1991) ("Attorneys . . . consistently produce low levels of accuracy in forecasting juror verdict preference . . . ."). Even if such predictions may be actionable, reliance would rarely, if ever, be reasonable and Plaintiff has not alleged facts in this case showing that such reliance would have been reasonable. *McCamish*, 991 S.W.2d at 794 (Tex. 1999) ("[S]ection 552 guards against exposure to unlimited liability by requiring that a claimant justifiably rely on a lawyer's representation of material fact.").

*Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996) ("Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event."); *Moncrief*, 481 F.3d at 314 ("The misrepresentation alleged by Moncrief concerned the future behavior of Gazprom—that Gazprom would continue to honor the agreements—rather than an existing fact."). Likewise, Ironshore's allegations about Schiff's determinations of whether certain information might negatively affect Dorel or whether certain evidence was relevant, *see, e.g.,* (Dkt. No. 10 at ¶ 34 ("Schiff falsely represented that the early trial date did not prejudice their preparations.")), similarly fail because they relate to future predictions rather than misrepresentations about an existing fact or circumstance.

Accordingly, Defendant's Motion is **GRANTED** to the extent Plaintiff's Amended Complaint depends on misrepresentations about future outcomes such as a possible jury verdict or settlement outcome. *See, e.g., id.* at ¶¶ 20, 24, 25, 27, 28, 29, 30, 33, 34, 43.

### 2. Opinions offered by certain professionals can form the basis of a negligent misrepresentation claim

Defendant argues that "statements of opinion" are not actionable under a theory of negligent misrepresentation. (Dkt. No. 17 at 7.) In particular, Defendant argues that Schiff's assessment that the first day of trial "went pretty well," (Dkt. No. 10 at ¶ 45), that the second day "was fine," *id.*, and that the third day "went well," *id.*, are not actionable misrepresentations either because they are predictions about a future event or mere puffery. (Dkt. No. 17 at 7–8.)

Plaintiff responds that while an opinion is generally not considered a negligent misrepresentation, certain professionals can be held accountable for providing a false or misleading opinion. (Dkt. No. 28 at 9.) Indeed, in *McCamish*, the Texas Supreme Court noted that "[a] *typical* negligent misrepresentation case involves one party to a transaction receiving and

relying on an evaluation, such as an opinion letter, prepared by another party's attorney." *McCamish*, 991 S.W.2d at 793 (emphasis added).

In light of *McCamish*, it is clear that a professional's opinion may give rise to a claim for negligent misrepresentation. *Id.* In fact, this is precisely what Section 552 contemplates. Restatement (Second) of Torts § 552(b) ("The rule stated in this Section applies not only to information given as to the existence of facts but also to an opinion . . . ."). However, *McCamish* also emphasized that liability under Section 552 only exists when it is reasonable to rely on the opinion proffered. *See, e.g., McCamish*, 991 S.W.2d at 794 (Tex. 1999) ("[S]ection 552 guards against exposure to unlimited liability by requiring that a claimant justifiably rely on a lawyer's representation of material fact. Thus, not every statement made by an attorney to a nonclient is actionable under section 552.").

In this instance, the Court is persuaded that Plaintiff's Amended Complaint fails to state a claim for negligent misrepresentation to the extent it relies on Schiff's subjective, general assessments of how trial went on a particular day.[6] First, these statements are mere puffery rather than affirmative misrepresentations. *See, e.g., Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (statements that a building was "superb, super fine, and one of the finest little properties in the City of Austin" were not misstatements under fraud theory because they were mere puffery (internal quotation marks omitted)). Moreover, even if they were the sort of misrepresentations that could give rise to liability under Section 552, Plaintiff has not alleged facts showing that it would have been reasonable for Ironshore to rely on Schiff's assessment that trial "was fine" or that it "went pretty well" in determining whether the jury might award a

---

[6] Defendant also argues that other opinions about whether certain settlements or outcomes were "warranted" or "unwarranted" are similarly outside the scope of a negligent misrepresentation claim. However, the Court has already concluded that these statements are predictions about the future rather than misstatements of existing fact and thus do not give rise to liability under a negligent misrepresentation theory. *See* Section III.B.1, *supra*.

particular sum of money.  *See McCamish*, 991 S.W.2d at 794 ("[S]ection 552 guards against exposure to unlimited liability by requiring that a claimant justifiably rely on a lawyer's representation of material fact.").

Accordingly, Defendant's Motion is **GRANTED** to the extent Plaintiff's negligent misrepresentation claim depends on Schiff's assessments about trial as outlined in the Amended Complaint, including that trial "was fine" or "went pretty well."  (Dkt. No. 10 at ¶ 45.)

### 3. <u>Omissions can form the basis for a negligent misrepresentation claim</u>

Schiff argues that omissions "do not support a claim for negligent misrepresentation" under Texas law.  (Dkt. No. 17 at 4.)  Indeed, Defendant maintains that "[t]he Fifth Circuit has expressly recognized that a negligent misrepresentation claim does not include omissions under Restatement Section 552."  (Dkt. No. 31 at 8 (citing *McLachlan v. New York Life Ins. Co.*, 488 F. 3d 624, 630 (5th Cir. 2007)).)  Defendant instead argues that omissions must be pursued under a different cause of action, such as fraud.  (*Id.* at 6–7.)

Plaintiff responds that negligent misrepresentation can arise where a person has a duty to speak and either does not do so or discloses something less than the whole truth, rendering their previous statements misleading.  (Dkt. No. 28 at 8 ("Having assumed an independent duty to Ironshore, Schiff was obligated to: disclose the whole truth; disclose new information showing an earlier representation to be misleading or untrue; and, make full disclosure when a partial disclosure conveys a false impression.").)

Resolving the question of whether a claim for negligent misrepresentation may ever be based on omissions requires the Court to again make an *Erie* guess.  However, neither party has pointed to any authority from the Texas Supreme Court on point.  Instead, Defendant primarily relies on two Fifth Circuit opinions, *McLachlan* and *Clardy Mfg. Co. v. Marine Midland Bus.*

*Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996). In *McLachlan*, the Fifth Circuit briefly discussed Section 552 of the Restatement, in interpreting Louisiana law, and then concluded that another section of the Restatement "does not impose an affirmative duty to warn everyone of the risk of physical harm." *McLachlan*, 488 F.3d at 630. Nevertheless, the Fifth Circuit went on to recognize that Louisiana courts "[have] extended the negligent misrepresentation theory to include situations of non-disclosure . . . where there was some sort of business relationship making it reasonable to imply an affirmative duty." *Id.* (internal quotation marks omitted). Texas courts have also recognized a similar principle. *See, e.g., Brown & Brown v. Omni Materials*, 317 S.W. 3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). *Clardy* is ultimately silent on the question of whether omissions, coupled with a duty to disclose, can give rise to a claim for negligent misrepresentation.

Absent controlling authority, Defendant next relies on opinions from intermediate Texas appellate courts. (Dkt. No. 17 at 5 (*Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 578–79 (Tex. App.—Dallas 2007, no pet.)).) However, as noted above, other Texas courts have recognized that a claim for negligent misrepresentation may sometimes be premised on omissions where the defendant has a duty to speak and fails to do so. *Compare Brown*, 317 S.W. 3d at 384, *with Kastner*, 231 S.W.3d at 578–79.[7] Having reviewed these competing authorities, this Court is persuaded that the Texas Supreme Court would permit a negligent misrepresentation claim to be premised on omissions by a party who has a duty to speak and does not, or one who partially speaks in a way that is misleading because of particular omissions. *See In re Int'l Profit Assocs.,*

---

[7] Defendant argues that cases allowing negligent misrepresentation claims to proceed based on omissions, such as Brown, "appear to conflate negligent misrepresentation with a fraudulent omission cause of action." (Dkt. No. 17 at 6.) The Court disagrees. *See, e.g., Coburn*, 342 F.3d at 377 (concluding, in the context of discussing a negligent misrepresentation claim, that "non-disclosures cannot be negligent unless there is a duty to disclose"). *Coburn*, and similar statements by many other courts in Texas, suggest that if there is a duty to disclose then non-disclosure could constitute negligent misrepresentation.

14

*Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) ("Failing to disclose information is equivalent to a false representation . . . when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent."); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979) ("[W]here there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts.").

In this case, Plaintiff has alleged that statements made by Schiff were either misleading when made or became misleading based on a failure to disclose subsequent developments. *See, e.g.,* (Dkt. No. 10 at ¶ 48 ("Schiff falsely represented that the last offer of settlement received from Plaintiffs was $6.5 million. Schiff failed to disclose to Ironshore, however, that Plaintiffs actually offered to settle for $3.25 million.").) This is adequate to state a claim for negligent misrepresentation.[8] *See, e.g., Brown*, 317 S.W.3d at 384 ("[W]hen one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue.").

### 4. Causation

Plaintiff argues it has adequately pleaded causation by alleging that "[h]ad Schiff timely reported the settlement offer and the true facts [about the *Hinson* case], Ironshore would have exercised its right to settle and paid the *Hinson* Plaintiffs to release all claims." (Dkt. No. 28 at 14; Dkt. No. 10 at ¶¶ 49, 55.)

Defendant raises several objections to Plaintiff's causation theory in its Motion. Primarily, Defendant argues that Ironshore cannot allege causation because Ironshore could not have forced Dorel to settle the *Hinson* case. (Dkt. No. 17 at 12–13, 16–19.) Defendant further contends that

---

[8] In particular, with respect to the various omissions that rendered previous misstatements misleading, (Dkt. No. 10 at ¶¶ 39–44, 48), Plaintiff has adequately alleged the remaining elements of a claim under Section 552. *Id.* at ¶ 55. However, the Court addresses Defendant's Motion with respect to the causation element in the next section.

15

Ironshore failed to exercise its right to associate at the outset of the *Hinson* case and, thus, has no right to "pursue Dorel's attorneys" for its own misstep. *Id.* at 15–16. Finally, Defendant argues that Ironshore's causation theory is too attenuated to be considered plausible. *Id.* at 19–20 ("Such a highly improbable series of hypothetical events and decisions were not adequately pleaded and regardless, are implausible." (internal quotation marks omitted).)

With respect to Defendant's first argument, both Parties agree that New York law controls because the underlying insurance contract between Dorel and Ironshore included a choice of law clause favoring the application of New York law. (Dkt. No. 17 at 11 ("The Ironshore policy is controlled by New York law . . . ."); Dkt. No. 28 at 15 ("New York law applies to the interpretation of the Ironshore Policy."); Dkt. No. 17-1 at 71.) Beyond that, the heart of the dispute is whether Ironshore could have settled the *Hinson* case without Dorel's consent. Defendant argues that nothing *permitted* Ironshore to engage in such a settlement and, thus, it could not. (Dkt. No. 17 ("Ironshore's 'opportunity to associate' in Dorel's defense did not allow Ironshore to force Dorel to settle or take any different actions.").) Plaintiff, by contrast, argues that because nothing *prevented* Ironshore from separately settling with the *Hinson* Plaintiffs, Ironshore could have, and would have, settled with the *Hinson* Plaintiffs had it known what it considers the real truth about the progress and status of the case. (Dkt. No. 28 at 15–16.)

Given that the Parties disagree about the application of New York law to this case, the Court must again venture an *Erie* guess to determine whether the highest court in New York State, the New York State Court of Appeals, would recognize that Ironshore could have settled with the *Hinson* Plaintiffs without Dorel's consent. On this point, neither party offered controlling or even particularly persuasive authority from the New York State Court of Appeals. However, having reviewed several relevant authorities, the Court is persuaded that under New York law Ironshore

could have settled with the *Hinson* Plaintiffs without Dorel's consent. *Melendez v. Hosp. for Joint Diseases Orthopedic Inst.*, 575 N.Y.S.2d 636 (Sup. Ct. 1991), *aff'd*, 579 N.Y.S.2d 74 (1992), is illustrative. In *Melendez*, the plaintiff, a doctor, objected to his hospital settling a malpractice claim which had been filed against him, fearing it would harm his reputation and eventually increase his insurance premiums. 575 N.Y.S.2d 287–288. The court in *Melendez* aptly summarized the two positions before it, which mirror the arguments before the Court in this case:

> Dr. Katz maintains nonetheless that the absence of a "waiver of consent" clause in his Bronx Lebanon Hospital employment contract mandates that no settlement can be consented to over Dr. Katz's objection consistent with due process. The flip side of this argument is FOJP's assertion that the absence of a contractual [sic] provision giving Dr. Katz the right to object to settlement within the policy limits dictates that he has no such right.

*Id.* Ultimately, the court in *Melendez* sided against the doctor, holding that because he had not negotiated for a consent to settle clause he was not entitled to object to a settlement. *Id.* Several other courts have reached similar results. *See, e.g., Dear v. Scottsdale Ins. Co.*, 947 S.W.2d 908, 914 (Tex. App.–Dallas 1997, writ denied) ("By purchasing an insurance policy that did not provide him the right to veto settlement of third-party claims, Dear gave up the right to complain that any settlement Scottsdale entered somehow damaged him. Had Dear desired to prohibit Scottsdale from settling disputed claims without his consent, he could have purchased a policy requiring his consent. Dear chose not to purchase a 'consent clause' policy, and we will not rewrite the policy to provide Dear with a provision for which he did not bargain."); *Webb v. Witt*, 379 N.J. Super. 18, 33–34 (App. Div. 2005) (recognizing that "the premium paid to the insurer reflects the presence or absence of a consent to settle clause" and concluding that reading such a right into a contract would impede public policy favoring settlement); *Bano v. Union Carbide Corp.*, 273 F.3d 120,

17

129 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages settlement of disputes.").[9] Although *Melendez* is by no means binding authority from the New York State Court of Appeals, it stands as persuasive authority that there is no basis to read into Dorel's insurance contract a right to object to Ironshore separately limiting its liability as to the *Hinson* Plaintiffs.

Accordingly, because nothing in the insurance contract between Dorel and Ironshore prohibited Ironshore from settling its claims with the *Hinson* Plaintiffs, or limiting its exposure through some other type of agreement, the Court next addresses whether Ironshore's underlying causation theory is too attenuated.[10] Having reviewed the Parties' arguments and relevant authorities, the Court is persuaded that at least at this juncture Plaintiff's causation theory is not too attenuated. Plaintiff has alleged that had it known about an earlier settlement offer from the *Hinson* Plaintiffs it would have either settled the case or come to some sort of agreement that limited its liability. Plaintiff also alleged that the *Hinson* Plaintiffs would have accepted these offers, which is at least plausible because they had extended the same offers to Dorel.

Finally, Schiff's argument that Ironshore cannot seek relief from Schiff because it failed to exercise its own right to associate is misplaced. Unlike the cases on which Defendant relies, this is not a malpractice or breach of contract case. *See* (Dkt. No. 17 at 14 (citing *MBIA Inc. v. Fed. Insurance Co.*, 652 F.3d 152, 167 (2d Cir. 2011)).) Instead, Plaintiff's allegation is that it did not exercise its right to associate because of Schiff's supposed misrepresentations. Recovery for a

---

[9] In light of *Dear*, to the extent Texas law controls, the Court is persuaded that the result would be the same. Neither the Texas Supreme Court nor the New York State Court of Appeals would read a consent to settle clause into the agreement between Dorel and Ironshore, nor is there any precedent to suggest that Dorel could have prevented settlement or some negotiation for a limitation of liability as between the *Hinson* Plaintiffs and Ironshore absent such a consent to settle clause. *See, e.g.,* Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insured*, § 5:3 Insurer's Duty When Insured Directs It Not to Settle (6th ed. 2017) ("An insurance company is free to exercise its own judgment as to whether to enter into a settlement. It can, therefore, absent an express policy provision to the contrary, settle a case despite the insured's request that it not do so." (internal footnotes omitted)).

[10] This question, relating to Plaintiff's underlying negligent misrepresentation claim rather than an interpretation of Ironshore's rights and responsibilities under its contract with Dorel, is governed by Texas law.

claim based on such an allegation may be mitigated by Plaintiff's decision not to associate, but recovery is not foreclosed by it.

## IV. Conclusion

Ultimately, the Court is persuaded that Defendant's Motion to Dismiss should be **GRANTED-IN-PART**. Specifically, the Motion is **GRANTED** to the extent Ironshore's negligent misrepresentation claim depends on Schiff's predictions about the future, such as the exposure the *Hinson* case presented to Ironshore, or Schiff's subjective assessments about trial going "fine" or "pretty well." However, Ironshore's allegation that Schiff misrepresented information about offers to settle made by the *Hinson* Plaintiffs, either directly or by failing to disclose subsequent, lower offers, is sufficient to state a claim for relief. Moreover, such claim is not barred by the doctrine of attorney immunity. Accordingly, with respect to this aspect of Plaintiff's negligent misrepresentation claim, the Motion is **DENIED**.

**So ORDERED and SIGNED this 9th day of January, 2018.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE